OLD DOMINION BOX COMPANY, Inc., and Dacam Corporation, Plaintiffs,

v.

CONTINENTAL CAN COMPANY, Inc., Defendant.

63 Civil 31.

United States District Court
S. D. New York.
July 17, 1967.

---

6. United Mine Workers of America v. Gibbs, supra, at p. 726, 86 S.Ct. 1130.

Harold James, of James & Franklin, New York City, for plaintiffs.

William K. Kerr of Fish, Richardson & Neave, New York City, for defendant.

## MEMORANDUM

GRAVEN, Senior District Judge.

1. The plaintiffs, Old Dominion Box Company, Inc., and Dacam Corporation, are corporations organized and existing under the laws of the State of Virginia. The principal place of business of each is Lynchburg, Virginia. The defendant, Continental Can Company, Inc., is a corporation organized and existing under the laws of the State of New York. Its principal place of business is New York City, New York.

The defendant, as assignee, is the owner of United States Letters Patent No. 2,986,857 issued on June 6, 1961, to H. Ganz, which patent is entitled, "MACHINE AND METHOD FOR PACKAGING ARTICLES," and United States Letters Patent No. 2,990,997 issued on July 4, 1961, to A. J. Weiss, which patent is entitled, "PAPERBOARD CARRIER." Those patents are referred to as the defendant's patents.

The plaintiffs brought this action under the provisions of Sections 2201 and 2202, Title 28 U.S.C.A. They seek declaratory relief with respect to the two patents referred to owned by the defendant. An actual controversy exists between the parties. There is diversity of citizenship between the plaintiffs and

the defendant. The amount in controversy is in excess of $10,000.00.

2. The plaintiff, Old Dominion Box Company, Inc., is now, and for a number of years has been, engaged in the business of manufacturing and selling cartons of various types, including paperboard cartons. The plaintiff, Dacam Corporation, is now, and for a number of years has been, engaged in the business of designing packaging machinery and equipment. It has been licensing its coplaintiff to use the packaging machines designed and patented by it. The defendant, Continental Can Company, Inc., is now, and for a number of years has been, a competitor of the plaintiff, Old Dominion Box Company, Inc., in the packaging field. The plaintiffs allege that for some time the defendant has been asserting and claiming that the plaintiffs have been infringing its patents. The plaintiffs brought this action so that they might secure a judicial determination with respect to the validity, infringement and enforceability of those patents. The defendant filed a counterclaim. In its counterclaim it asked that its patents be held to be valid and that the plaintiffs be held to have infringed them. Because of this feature, the case was tried as a conventional patent case.

3. The issues between the parties as defined in the governing pretrial order are as follows:

(a) Are the defendant's patents valid or invalid?

, (b) If valid, have the plaintiffs infringed them?

(c) Whether the defendant has been guilty of such conduct as to make its rights under the patents, or either of them, unenforceable.

(d) Whether an award of attorneys' fees should be made to either the plaintiffs or the defendant.

4. Since around 1940 there have been two developments in the packaging field relating to products merchandised in cans, bottles, and other containers which furnish the background for this litigation. During that period there was in that field an increasing demand for packages which would securely hold multiple containers and which could be easily handled and readily unpacked. The other development was that of automation. There was an increasing use of cartons and packaging machines by means of which multiple containers were rapidly and automatically packaged for distribution purposes.

The patents involved in this case relate to the cartons and packaging machines used for what is referred to as wrap-around packaging. While cartons used in connection with wrap-around packaging are encompassed in the generic term of folding cartons, yet by common usage in the trade a distinction is made between wrap-around cartons and folding cartons. Folding cartons are known as cartons which are fed into a machine in flat form and made into a box-like shape and then filled with containers. Wrap-around cartons are known as cartons which are used in packaging operations in which the package comes into existence as it is being wrapped around the containers. It is a one-step operation rather than a two-step operation. The wrap-around system is used exclusively for the packaging of multiple containers.

5. Cartons used in connection with wrap-around packaging are, in general, made of paperboard. They are furnished in knockdown, flat form by the supplier to the packager. The carton blanks are precut to suit the particular containers to be packaged. Fold, or score, lines have been made in them where the blanks are to be folded as they are wrapped around the containers. When being wrapped, the carton is rectangular in form; has two side panels or walls; a top and a bottom wall; two overlapping enclosure panels forming either the top or bottom wall. Wrap-around cartons may have either open or closed ends. In wrap-around packaging, blank cartons in flat form are fed into a packaging machine. The carton blanks are then brought into connection with the containers which are to be packaged. The machine folds the side panels of the carton around the

containers and then folds the closure panels into an overlapping relationship. Finally the overlapping panels are locked into position and completely wrapped packages emerge from the machine. It is a high speed operation and from 120 up to 200 packages a minute are made.

6. Prior to 1956 a corporation known as the Robert Gair Company was active in the packaging field. In that year it merged with the defendant, Continental Can Company, Inc., and the business formerly carried on by it since has been carried on by a division of the defendant, Continental Can Company, Inc. The defendant, Continental Can Company, Inc., has been and is engaged in, among other activities, the manufacture and sale of cartons for wrap-around packaging and the leasing out of machines designed for such packaging. The Robert Gair Company, during the period of its existence, and later the defendant, Continental Can Company, Inc., used or were attempting to use a number of different wrap-around systems. In some of those systems the cartons were made secure by gluing the overlapping closure panels together. In one of those systems the cartons were made secure by stapling. In another system the cartons were locked into place by so-called punch locking. In that system synchronized moving machine parts punched small tabs into matching slots in other panels. The Robert Gair Company and the Continental Can Company, Inc., used the different systems referred to. They found unsatisfactory features in connection with all of them. The system making use of glue involved messy glue pots. The glued containers required time and space for drying, which features necessitated the availability of a substantial amount of floor space. The system using stapling met with poor customer response. The successful operation of punch locking required a high degree of synchronization of numerous moving parts which gave rise to difficulties when operated at high speeds. In the wrap-around packaging field, the packagers desire a system which is rapid in operation, which functions without breaking or tearing the cartons, and in which there is a minimum of interruptions for repairs and realignments. The packagers and the consumers also desire a package which holds the containers securely in the carton. This feature is of special importance in the case of open end cartons. The consumers desire a package which is easy to carry. They also desire a package which can be readily opened and closed. This latter feature is of importance in the case of multiple containers because it is the frequent practice of consumers to remove only part of the containers at a time and then close the carton.

7. Arthur J. Weiss, also known as A. J. Weiss, for many years prior to its merger with the defendant, Continental Can Company, Inc., had to do with designing cartons for the Robert Gair Company. After the merger he had to do with the designing of cartons for the merged company. Starting prior to 1958, he commenced work for the merged company (hereinafter referred to as the defendant) on a design for a wrap-around paperboard carton. On July 15, 1958, he filed an application for a patent on what is entitled, "PAPERBOARD CARRIER." The application was No. 7,248,728. On July 4, 1961, United States Letters Patent No. 2,990,997 was issued to him pursuant to his application. The defendant has at all times since the issuance of that patent been the owner thereof. It is the claim of the defendant and the plaintiffs have been and are infringing Claims 1, 2 and 4 of that patent.

8. The Ganz Brothers Machine Company is a corporation which was and is engaged in the building of special machinery. Henry Ganz, also known as H. Ganz, was and is the president of that corporation. In 1956, under arrangements with the Robert Gair Company, the Ganz Brothers Machine Company commenced work on the design of a machine for wrap-around packaging. That work was continued under arrangements with the defendant after its merger with the Robert Gair Company. Pursuant to those

arrangements, the Ganz Brothers Machine Company designed and built wrap-around packaging machines of the punch-lock type. Difficulties were encountered in the locking of the cartons when those machines were operated at a high speed. It was then sought to design and build a packaging machine that had a locking mechanism which operated more satisfactorily than the punch-lock mechanism. A machine was then designed and built which made use of the carton of Weiss Patent No. 2,990,997 and what is referred to as a slide-lock mechanism, which was designed to effectuate the carton lock in the Weiss carton. On June 26, 1958, H. Ganz filed an application for a patent for what was entitled, "MACHINE AND METHOD FOR PACKAGING ARTICLES." On June 6, 1961, United States Letters Patent No. 2,986,857 was issued to him. The defendant, Continental Can Company, Inc., has at all times since the issuance of that patent been the owner thereof.

9. The plaintiff, Dacam Corporation, is engaged in the business of developing machinery for the automatic packaging of cartons. It has designed and patented various machines intended for that purpose. It designed and patented, among other machines, a machine known as D-300. It licensed the plaintiff, Old Dominion Box Company, Inc., to use those machines. That latter company, in turn, sublicensed the machines. It is the claim of the defendant that the use of those machines infringes Claim 4 of its Patent No. 2,986,857 issued to H. Ganz, heretofore referred to.

10. The defendant's wrap-around packaging system making use of the Weiss carton and the Ganz machine is known as the JAK-ET-PAK system. That system has proved to be a very good system and has had substantial commercial success. That system has not dominated the field. Wrap-around cartons with punch locks were in commercial use before the JAK-ET-PAK system and are still in such use. What is referred to as the Mead-Atlanta "Cluster-Pak", making use of a type of punch lock, as an important factor in the industry, particularly where containers are packaged at low speeds. What is referred to as the Container Corporation's "Bikini" system, utilizing two different kinds of glue, is also an important factor in the industry, particularly in the packaging of beer. However, it is clear that the JAK-ET-PAK system does excellent wrap-around packaging at very high speeds. In the JAK-ET-PAK system the carton is folded around the containers and then closed by locking. The parties are in agreement that the defendant's patents for that carton and machine are based on a combination of old elements. It is the contention of the defendant that the patentable invention claimed meets the tests and requirements for a valid combination patent and that such invention is disclosed by the patents. The patentable invention claimed by the defendant is the claimed tightening of the package allegedly occurring during the locking process when a Weiss carton is used in connection with the Ganz machine.

11. In the Weiss carton there is what is described by the defendant as the primary lock. That lock consists of an opening in one of the overlapping closure panels and a latching flap or catch as a part of the other overlapping closure panel. The latching flap is made integrally with a series of catches. After the overlapping panel is moved against the top or bottom of the container, the latching flap is bent back and the catches are inserted in the matching slots. Then by rotary action the latching flap rotates or pivots. A. J. Weiss, to whom the carton patent was issued, testified at the trial. The defendant in its brief stated:

"* * * Weiss pointed out * * * that tightening of the package occurs as a result of rotary action when the latching catch of the primary lock hooks around the edge of the latch opening, creating lateral movement of the closure flaps to draw them to their position of greatest overlap. * * *"

In that connection, counsel for the defendant in his opening statement stated:

"* * *' That tightening effect is the result of what we call a camming action between these catches and the slots in which they are engaged. That camming action converts the rotary motion of the flap to a lateral motion so that the overlapping panels are drawn together to their maximum position of overlap. This is what provides the tight pack, which is so essential in open end wrap-around cartons."

12. In the Ganz machine patent, it is stated that the invention had special application to use with cartons of the type disclosed by the Weiss patent. In the matter of invention claimed by the defendant, those patents are closely intertwined. In a packaging operation making use of the JAK-ET-PAK system, the machine first folds the side panels of the carton downwardly. Then in a series of operations by means of stationary guiding bars or blades, the machine continues to fold the carton until it is rectangular in form. The machine then performs the locking of the carton. The locking operations as to the carton are performed by the locking mechanism of the machine. Those operations are performed by an arrangement of folding swords which are properly shaped and positioned for that purpose. There are no moving parts in the locking mechanism of the machine.

The locking mechanism of the machine is the particular part of the machine here in issue. By means of the locking mechanism, the primary lock of the carton is locked. That lock, as heretofore noted, consisted of a latching flap and its integral catch. In the locking operation, the latching flap is positioned with its integral catch. Then by means of rotary or pivotal action, the flap is locked into its integral catch. It is the contention of the defendant that such pivotal action "provides the essential tight pack."

13. In the Weiss carton Patent No. 2,990,997, the prior patents referred to are:

| | | |
|---|---|---|
| 1,669,454 | Close | May 15, 1928 |
| 1,996,997 | Inman | Apr. 21, 1935 |
| 2,025,201 | Graham | Dec. 24, 1935 |
| 2,102,497 | Trogman | Dec. 14, 1937 |
| 2,140,932 | Avery | Dec. 20, 1938 |
| 2,304,362 | Huye | Dec. 8, 1942 |
| 2,572,159 | Kells | Oct. 23, 1951 |
| 2,786,572 | Gentry | Mar. 26, 1957 |
| 2,798,603 | Grinspoon | July 9, 1957 |
| 2,857,048 | Johnson | Oct. 21, 1958 |

The plaintiffs introduced into evidence on the matter of the anticipation of the Weiss patent the following in connection with the matter of prior art:

| | | |
|---|---|---|
| Calahan | 575,775 of Jan. | 26, 1897 |
| Morrison | 1,104,821 of July | 28, 1914 |
| Close | 1,669,454 of May | 15, 1928 |
| Graham | 2,025,201 of Dec. | 24, 1935 |
| Pergande | 2,060,240 of Nov. | 10, 1936 |
| Trogman | 2,102,497 of Dec. | 14, 1937 |
| Avery | 2,140,932 of Dec. | 20, 1938 |
| Poe | 2,316,362 of April | 13, 1943 |
| Lighter | 2,395,558 of Feb. | 26, 1946 |
| Crary | 2,419,391 of April | 22, 1947 |
| Kells | 2,572,159 of Oct. | 23, 1951 |
| Tyrseck | 2,586,886 of Feb. | 26, 1952 |
| Tyrseck | 2,660,361 of Nov. | 24, 1953 |
| Gentry | 2,786,572 of Mar. | 26, 1957 |
| Grinspoon | 2,798,603 of July | 9, 1957 |
| Gentry | 2,827,165 of Mar. | 18, 1958 |
| Andre | 2,911,096 of Nov. | 3, 1959 |
| Currivan | 2,922,561 of Jan. | 26, 1960 |
| Stone | 2,975,891 of Mar. | 21, 1961 |
| French | 1,063,058 of April | 29, 1954 |

Those included the following patents referred to in the patent: Close, No. 1,669,-454; Graham, No. 2,025,201; Trogman, No. 2,102,497; Avery, No. 2,140,932;

**556**

Kells, No. 2,572,159; Gentry, No. 2,786,-572; Grinspoon, No. 2,798,603.

14. In connection with the matter of anticipation of the Weiss patent and in connection with another issue related to that patent, reference will be made to some other matters relating to that patent.

The Federal Paper Board Company was and is engaged in the making of paper cartons and the packaging of those cartons. It was previously known as the Morris Paper Mills. It had in its employ Edwin L. Arneson whose position with the corporation was that of a structural design engineer. He is also referred to as E. L. Arneson. The plaintiffs contend that apart from the anticipation shown by the cartons covered by the prior art patents referred to there was direct anticipation of the Weiss carton by E. L. Arneson. On April 5, 1960, Patent No. 2,931,152 was issued to E. L. Arneson, a patent for a can packaging machine. The application for the patent was filed June 30, 1958. The machine which was the subject matter of the patent was designed by him. It was designed to be used for the packaging of paper cartons. In the patent are drawings, Figures 10 and 11, depicting what is described as a typical wrapper member which was adapted to be employed with the machine. It is the contention of the plaintiffs that the cartons depicted directly anticipate the carton which is the subject matter of the Weiss patent. Arneson first conceived the carton between May 7, 1957, and June 6, 1957. The earliest date claimed by Weiss for the conception of Weiss Patent No. 2,980,997 here in suit was October 8, 1957. It is the contention of the plaintiffs that the Arneson carton embodies and portrays a carton similar to and practically identical with the carton which is the subject matter of the Weiss patent and hence directly and completely anticipated that carton. It is the contention of the defendant that Arneson, at the time of the conception of his carton and at the time of his application for and the securing of his machine Patent No. 2,931,152, had no concept of a carton blank which might produce an automatic tightening of the blanks around its contents.

15. It was heretofore noted that the application for the Weiss patent was filed on July 15, 1958. On December 24, 1959, Arneson filed an application for a patent on an improvement on a carton for cylindrical articles. On October 24, 1961, he made an amendment to his application. In the amendment he set forth claims which incorporated Claims 1, 2 and 4 of Weiss Patent No. 2,990,997 here in suit. On May 15, 1962, the Patent Office declared an interference to exist between Arneson's application and the Weiss Patent No. 2,990,997. On October 17, 1962, Arneson filed with the Patent Office a concession of priority in favor of the Weiss patent. On October 31, 1962, the Patent Office sent the following communication to the inventor: "As required by Public Law No. 87–831, (76 Stat. 958) approved October 15, 1962, notice is hereby given the parties of the requirement of that law for filing in the Patent Office a copy of any agreement 'in connection with or in contemplation of the termination of the interference.'" The statute referred to appears as subsection (c) of Section 135, Title 35 U.S. C.A., which provides that failure to file a copy of such agreement shall render permanently unenforceable any patent involved. On December 7, 1962, there was filed with the Patent Office a letter from counsel for Weiss stating that the concession of priority previously filed with the Patent Office set forth the only agreement or understanding of the parties to the interference made in connnection with or in contemplation of the termination of such interference. On December 14, 1962, the Patent Office terminated the interference proceedings.

On June 18, 1962, during the pendency of the interference proceedings, the defendant, Continental Can Company, Inc., and the Federal Paper Board Company entered into an agreement under provisions of which the latter company was granted a license under the Weiss patent. That agreement was not filed with the Patent Office. It is the contention of

the plaintiffs that the agreement was of such a character as to require the filing of it in the Patent Office under the provisions of Section 135(c), Title 35 U.S.C.A., and that because it was not filed the defendant may not enforce any rights that it might have under the Weiss patent. The defendant controverts that contention.

16. It is the claim of the plaintiffs that Claim 4 of the Ganz patent was anticipated by certain prior patents. The prior art patents referred to in the Ganz patent are as follows:

| | | |
|---|---|---|
| 2,751,730 | Gentry | June 26, 1956 |
| 2,809,484 | Gentry | Oct. 15, 1957 |
| 2,809,486 | Gentry | Oct. 15, 1957 |

The plaintiffs introduced into evidence as prior art patents in connection with the Ganz patent the following:

| | | |
|---|---|---|
| Heybach | 995,965 | of June 20, 1911 |
| Lane | 1,624,257 | of April 12, 1927 |
| Pergande | 2,060,240 | of November 10, 1936 |
| Banta | 2,305,130 | of December 15, 1942 |
| Wood | 2,625,778 | of January 20, 1953 |
| Monroe | 2,780,900 | of February 12, 1957 |
| Tobey | 2,823,501 | of February 18, 1958 |
| Arneson | 2,931,152 | of April 5, 1960 |
| Galloway | 2,979,876 | of April 18, 1961 |
| German | 598,010 | of June 4, 1934 |
| Anness | 2,817,197 | of December 24, 1957 |
| Arneson | 2,860,461 | of November 18, 1958 |
| Murray | 2,953,879 | of September 27, 1960 |

17. The carton which is the subject matter of the Weiss patent and the machine which is the subject matter of the Ganz patent are very closely related. It is the claim of the defendant that the plaintiffs are infringing Claims 1, 2 and 4 of the Weiss patent and Claim 4 of the Ganz patent. Claims 1, 2 and 4 of the Weiss patent are as follows:

"1. A wrap-around carrier having overlapping closure panels, one of the panels having a latching extension disposed beyond a transverse pivot line located within the overlap of the closure, the latching extension being formed with a catch which, when the latching extension is brought toward the other panel, is received in a latch opening in the other panel, the base of the catch being tightly aligned with the adjacent edge of the latch opening when the overlapping panels are drawn into their positions of maximum overlap, the overlapping edge of the inner one of said overlapping panels being spaced from the fold line of the other of said overlapping panels and said overlapping panels being free to be drawn together as the catch is hooked around said adjacent edge of the opening and the latching extension is pressed against the other panel to bring the side walls of the carrier tightly against the contents of the carrier whereby the action of the catch will produce an automatic tightening of the side walls against the contents as it cams or levers the closure panels into the fully closed overlapping position.

"2. A paperboard blank for forming a wrap-around carrier for cylindrical objects such as cans having chines at their ends, said blank being rectangular in form and having five transverse fold lines which define three body panels and a closure panel extending from the outer end of each of the outer body panels and a latching flap at the end of one closure panel, said closure panels being of a width such that they overlap when the carrier is in erected position, a catch in one of said closure panels and an opening in the other closure panel both of which are within the overlap when the carrier is in erected position so that the catch can be received within the opening, the transverse fold line which defines said latching flap being within the overlap of the closure panels when the carrier is in erected position, said catch extending from said latching flap across and interrupting said fold line in the closure panel so that, when the carrier is being erected and said latching flap is being folded back, the catch hooks around the edge of the opening to draw the overlapping panels together.

"4. A paperboard blank for forming a wrap-around carrier for cylindrical objects such as cans having chines at their ends, said blank being rectangular in form and having transverse fold lines which define body panels and a closure panel extending from the outer end of each of the outer body panels, the outer ends of said closure panels forming the outer ends of said blank, said closure panels being of a width such that they overlap when the carrier is in erected position, one of said closure panels having a latching extension disposed along the free end of the closure panel beyond a bending axis disposed in said one closure panel, a catch in said one closure panel and an opening in the other closure panel, both of which are within the overlap when the carrier is in erected position so that the catch can be received within the opening, the bending axis being within the overlap of the closure panels when the carrier is in the erected position, said catch extending from said latching extension with its base portion substantially in line with and interrupting said bending axis, so that when the carrier is being erected and said latching extension is being folded back about said bending axis, the catch hooks around the edge of the opening to draw the overlapping panels together."

Claim 4 of the Ganz patent is as follows:

"4. In a machine for applying to cans and the like arranged in rows, a wrap-around carton having closure panels one of which has a latch opening and the other of which includes a pivotal catch for engagement with said latch opening, the combination comprising means for folding the pivotal catch panel and for engaging the pivotal catch through said latch opening, and means for swinging the pivotal catch into substantially the plane of the folded closure panels."

18. It is the contention of the plaintiffs that the Ganz patent does not particularly point out and distinctly claim the claimed invention.

The plaintiffs, as to Claim 4 of the Ganz patent, in their brief state as follows:

"Claim 4 does *not* include any tightening action. It calls for means for producing three manipulations:

1. Folding the pivotal catch relative to its associated closure panel;

2. Engaging the pivotal catch through the latch opening; and

3. Swinging the pivotal catch into substantially the plane of the folded closure panel.

"Tightening action is not inherent in these manipulations, which may or may not produce a tightening action, depending upon the particular overlap relationship between the closure panels and the degree to which the pivotal catch is folded relative to its associated closure panel."

The plaintiffs contend that nowhere in the Ganz patent is the claimed invention

as to the tightening particularly pointed out and distinctly claimed. They contend that because of that claimed situation the Ganz patent is invalid because of vagueness and indefiniteness as to the matter of the claimed invention.

In connection with Claims 1, 2 and 4 of the Weiss patent the plaintiffs contend that those claims are invalid because they are too vague and indefinite. In their brief the plaintiffs state:

> "It is essential that the public be able to read the patent claims and determine with a reasonable degree of certainty what structures are and are not covered thereby. The claim interpretation which defendant presents, involving the question of whether or not the locking structure as actually manipulated has produced a 'tightening effect', makes it impossible for a competitor to determine whether his product infringes. * * * The only way one can tell is by knowing just how the carton was manipulated as it passed through the assembly machine. Anomalously, if it was manipulated as *actually disclosed* in the Ganz patent in suit, so that *no* tightening effect is produced by the locking structure, there would be *no* infringement. * * * "

The defendant contends that the Weiss patent is not vague and indefinite as to the matter of tightening. In that connection in its brief it states:

> "The disclosure of the Weiss specification makes it clear that Mr. Weiss's objective was to design a wrap-around carton blank for simultaneously forming and filling a tight, open-ended package. * * *.
>
> " * * *
>
> "Insofar as the issues in this case are concerned, only the 'primary lock' of the Weiss patent requires consideration. This primary lock consists of an opening in one of the overlapping closure panels and a latching flap and catch as part of the other overlapping closure panel. This arrangement, in a properly designed and dimensioned carton blank, provides the rotary latch-

ing action, resulting in automatic tightening of the carton against the side walls of the cans (Weiss, Tr. 219). The 'secondary lock' is useful for keeping the primary lock in place after it has been completed (Weiss, Tr. 220–221).

> " * * *
>
> "Each of claims 1, 2 and 4 in suit includes reference to this crucial tightening action. Claim 1 states that 'the action of the catch will produce an automatic tightening of the side walls against the contents as it cams or levers the closure panels into the fully closed overlapping position.' Claims 2 and 4 refer to 'the catch hook[ing] around the edge of the opening to draw the overlapping panels together.' "

The defendant contends that the Ganz patent is not vague and indefinite as to the matter of tightening. The defendant in its brief states as follows in that connection:

> " * * * His [Ganz] machine was specifically designed for forming, filling, and locking wrap-around carton blanks of the Weiss patent in suit to produce multipacks. In this regard, the Ganz patent specification states (col. 1, ll. 12–23):
>
> > " 'My invention has special application to use with paperboard cartons of the type disclosed in the copending application of Arthur J. Weiss, Serial No. 748,728, filed July 15, 1958, a continuation-in-part of Serial No. 613,935, filed February 7, 1958, now abandoned. Such cartons have overlapping closure panels, one of which has a latch opening and the other of which includes a pivotal catch for engagement with such latch opening. In applying such a carton to cans, the closure panels in the completed package are locked together. The catch of one panel is inserted within the latch openings of the other panel, and is then swung so as to lock the catch.'
>
> "Mr. Ganz testified (Tr. 629) that one of the objectives he wanted to ac-

complish was to design a locking mechanism which would provide a tight package. Reference is made to this objective in the Ganz patent specification as follows:

" 'The pivotal catch must be inserted and locked so as to maintain a tight finished package.' (col. 1, ll. 39–40)

"The machine of the Ganz patent, when properly adjusted, produces and maintains 'a tight finished package' (Ganz, Tr. 628, 633–35; Myers, Tr. 833–4; 862)."

■■ 19. The contentions and arguments of the parties referred to as to the matter of vagueness and indefiniteness require a consideration of certain statutes and decisions relating thereto. Under the provisions of Section 111, Title 35 U.S.C.A., it is provided that an application for a patent shall have a specification as prescribed by Section 112, Title 35 U.S.C.A., and a drawing as prescribed by Section 113, Title 35 U.S.C.A. Section 112, Title 35 U.S.C.A., referred to provides, in part, as follows:

"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention. * * * "

It is well established that the claims of the patent constitute the measure of invention monopoly. Graver Tank & Mfg. Co. v. Linde Co. (1949), 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672. It is also well established that the claims of a patent are to be interpreted and read in the light of the specifications. Schriber-Schroth Co. v. Cleveland Trust Co.

(1940), 311 U.S. 211, 312 U.S. 654, 61 S.Ct. 235, 85 L.Ed. 132.

In the case of Graver Tank & Mfg. Co. v. Linde Co., supra, the United States Supreme Court, in discussing that portion of a statute which appears as Section 112, Title 35 U.S.C.A., requiring an inventor to separately state his claims and to particularly point out and distinctly claim what he regards as his invention, stated (p. 277 of 336 U.S. p. 538 of 69 S.Ct.):

" * * * While vain repetition is no more to be encouraged in patents than in other documents, and claims like other statements may incorporate other matter by reference, their text must be sufficient to 'particularly point out and distinctly claim' an identifiable invention or discovery. * * * "

It was heretofore noted that the two patents here in question are based on a combination of old elements. In the case of Halliburton Oil Well Cementing Co. v. Walker (1946), 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3, there was involved a patent based on a combination of old elements. The particular issue in the case was whether the inventor had particularly pointed out and distinctly claimed what he claimed was his invention under the provisions of the statute heretofore referred to and set out. The Court stated (p. 3 of 329 U.S. p. 7 of 67 S.Ct.): "This statutory requirement of distinctness and certainty in claims is important in patent law." The Court, after stating that the courts have viewed claims to patents based on combinations of old elements with very close scrutiny, goes on to state (p. 10 of 329 U.S. p. 11 of 67 S.Ct.): "It is quite consistent with this strict interpretation of patents for machines which combine old elements to require clear description in combination claims."

20. In neither Claim 4 of the Ganz patent nor in any other claims therein is there any mention made of any tightening effect produced by the locking mechanism of the Ganz machine. In the specification references are made to a great many matters. Included in the references is a brief reference to the matter of maintaining a "tight finished package". It

○

is the finding of the Court that the Ganz patent does not particularly point out and distinctly claim the invention presently claimed as required by Section 112, Title 35 U.S.C.A.

21. The situation is not the same as to the Weiss patent. In Claim 1 of that patent the matter of "automatic tightening" is particularly pointed out and is distinctly claimed. It is the finding of the Court that the Weiss patent does particularly point out and distinctly claim the invention claimed.

22. It was heretofore noted that it was the contention of the plaintiffs that the defendant could not enforce the Weiss patent because the provisions of Section 135(c), Title 35 U.S.C.A., hereafter set out, were not complied with in regard to the matter of the filing of the agreement between the Federal Paper Board Company and the Continental Can Company, Inc., in connection with the termination of the interference proceedings between the Arneson carton and the Weiss carton. Section 135(c), requiring the filing of settlement agreements in connection with the termination of interference proceedings, was enacted on October 15, 1962, while the interference proceedings were still pending. The attorneys have cited no cases arising under that statute.

In the House Committee Report relating to that enactment, which appears in United States Code and Congressional and Administrative News, 87th Congress, Second Session, 1962, pp. 3286–3289, the following appears:

### "PURPOSE

"The purpose of this bill is to amend the patent laws to require the filing in the Patent Office of agreements settling patent interference proceedings. When two or more applicants claim substantially the same invention an interference is declared in order to determine which applicant is entitled to priority. Interference proceedings may be terminated in a manner hostile to the public interest by using patent interference settlement agreements as a means of restricting competition. To make such a practice more difficult the bill requires the filing of such agreements in the Patent Office."

In material accompanying the Report it was stated that the United States Supreme Court had, in the absence of a statute, condemned a particular private interference settlement. Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co. (1945), 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381.

In 1955 a license agreement had been entered into between Morris Paper Mills, the corporate predecessor of Federal Paper Board Company, and the Robert Gair Company, the corporate predecessor of the Continental Can Company, Inc. Various questions had arisen between the parties as to what extent the Federal Paper Board Company had rights to the JAK-ET-PAK developments of the Continental Can Company, Inc. Negotiations between the parties had extended for a considerable period of time prior to June 18, 1962. On June 18, 1962, the Federal Paper Board Company and the Continental Can Company, Inc., entered into the agreement heretofore referred to. The agreement was quite lengthy. Under it the Federal Paper Board Company secured an exclusive license for the Weiss carton and for the Ganz machine. On June 18, 1962, on the day the agreement was executed and while the interference proceedings were still pending, counsel for the defendant, Continental Can Company, Inc., wrote counsel for the Federal Paper Board Company, in part, as follows:

"Obviously, the public use referred to in your letter of May 21, 1962 would constitute a bar to the allowance of any valid claims in the Arneson application which would cover the Weiss carton. However, the disclosures in the application and in patent No. 2,990,997 are not identical and possibly limited claims could be drawn which would not be generic. Whether any such claims, if obtained, would be of any value is questionable, particularly in view of the fact that the lock per se is broadly old as shown in Trogman patent No. 2,-

102,497, which we note is cited in 2,-990,997.

"If you feel the interests of both parties will best be served by abandoning the Arneson application, we are authorized to drop the prosecution of the same. * * *."

It is the contention of the defendant that by the time the agreement of June 18, 1962, was entered into Federal's patent counsel were of the view that the Arneson application could not prevail over the Weiss patent in the interference proceedings and for that reason a concession of priority was filed and that the agreement of June 18, 1962, was not an agreement in connection with or in contemplation of the termination proceedings.

The agreement of June 18, 1962, contained numerous provisions covering many matters. Some of its provisions related to the Weiss patent. In those provisions Continental granted Federal an exclusive license to manufacture and sell cartons under the Weiss patent. The agreement contained no specific provision for the termination of the interference proceedings as to the Weiss patent, yet the licensing of Federal under the Weiss patent, for all practical purposes, made it improbable that the interference proceedings would or could be continued. The parties to the agreement apparently recognized that fact, for on the very day the contract was entered into counsel for Continental wrote counsel for Federal in regard to the matter of terminating the interference proceedings, which was done.

 Realistically, it is difficult to envision the agreement of June 18, 1962, other than as an agreement "in connection with or in contemplation of the termination of the interference." It seems clear that at the time the agreement was signed there was in the contemplation of the parties a termination of the interference proceedings. It is the finding of the Court that the agreement of June 18, 1962, did constitute an agreement within the purview of Section 135 (c), Title 35 U.S.C.A.

23. The matter of the prior art relied on by the plaintiffs in connection with Claim 4 of the Ganz patent will next be considered. That claim is very short. For convenience in reference, it will be set out again:

"4. In a machine for applying to cans and the like arranged in rows, a wrap-around carton having closure panels one of which has a latch opening and the other of which includes a pivotal catch for engagement with said latch opening, the combination comprising means for folding the pivotal catch panel and for engaging the pivotal catch through said latch opening, and means for swinging the pivotal catch into substantially the plane of the folded closure panels."

The prior art patents introduced into evidence by the plaintiffs are thirteen in number. Nine of them relate to machines for closing conventional folding cartons and four of them relate to machines for applying wrap-around cartons.

The plaintiffs make special reference to Heybach Patent No. 995,965, Banta Patent No. 2,305,130, German Patent No. 598,010, Wood Patent No. 2,625,778, Monroe Patent No. 2,780,900, and Tobey Patent No. 2,823,501. It is the contention of the plaintiffs that all of those patents disclose machines adapted to close and lock folding cartons, the cartons having a closing and locking structure which includes a pivotal catch which is adapted to be folded relative to the closure panel to which it is attached, then inserted through an opening in the other overlapping closure panel, and then swung into substantially the plane of the folded closure panels, the machines in question automatically performing the described manipulation steps. The defendant contends that those patents all relate to machines having to do with folding cartons and not with wrap-around packaging as to cans arranged in rows. Three of the prior art patents—Anness Patent No. 2,817,197, Arneson Patent No. 2,860,461, and Murray Patent No. 2,953,-879—do relate to machines designed for wrap-around packaging. The defendant

contends that those machines are not pertinent because they are machines directed to the use of glue in the packaging.

The plaintiffs contend that the Ganz machine was directly anticipated by Arneson Patent No. 2,931,152 of April 5, 1960. About July, 1957, Arneson designed and built a carton carrier machine. It would appear that the earliest date of the conception of the Ganz machine was in October, 1957. It is the contention of the plaintiffs that Arneson's machine corresponds to Claim 4 of the Ganz patent. The plaintiffs contend that the Arneson machine wrapped cartons around groups of cans and locked the cartons where the cartons corresponded to and had locking arrangements virtually identical with the cartons involved in the Ganz patent.

Arneson filed an application for a patent on the machine designed by him on June 30, 1958, which was four days after Ganz had filed an application for a patent on his machine.

It is the contention of the plaintiffs that Arneson was a prior inventor. In that connection the defendant in its brief states as follows:

> "In order for Arneson to qualify as a prior inventor, plaintiffs must prove:
>
> (a) That Arneson conceived the invention and reduced it to practice before Ganz did so, or
>
> (b) If plaintiffs are unable to establish the facts set forth in (a), they must establish that Arneson was diligently working toward a reduction to practice at a time just prior to October, 1957, the date on which Ganz commenced his inventive activities, and that Arneson continued to work diligently thereafter until he reduced the invention to practice."

It is the view of the Court that the plaintiffs are put to the proof of either (a) or (b).

The defendant further states that the Arneson machine was a single row machine and not directed to applying wrap-around cartons to "cans and the like arranged in rows" as was the Ganz machine.

The plaintiffs contend that Arneson had reduced his machine to practice before Ganz conceived his machine. They also contend that the difference between a one-row machine and one directed to the applying of wrap-around cartons to cans arranged in rows is not of significance.

Arneson testified that modification would have to be made to his single row machine to make it suitable for applying wrap-around carton blanks to double rows of cans as called for in the Ganz patent. He also testified that he did not know whether his machine, if so modified, would work.

It was heretofore noted that Arneson did not file his application until four days after Ganz filed his application.

In September, 1958, the Federal Paper Board Company caused the Arneson machine to be shipped to one T. Walter Kaestner, an outside engineering consultant relied on by it, to study and investigate the general functioning of the machine. Kaestner made trial runs on an experimental basis in which various cartons were folded into place and locked. He found that at low speeds the machine functioned very well. He experienced difficulty when he tried to fold cartons at high speeds. He was of the opinion that changes were necessary, perhaps costly in character, to make the machine operate at higher speeds in order to provide the versatility desired by the Federal Paper Board Company. In his report to Federal he suggested a number of changes which might be made in the machine to give it the versatility desired. The machine was returned by Kaestner to Federal. No changes were made in it. After its return it was in Federal's plant in New Haven, Connecticut, and not used thereafter.

The Court is of the view that the plaintiffs have not established either (a) or (b) heretofore set forth.

24. There is for consideration the question as to whether Claim 4 of the Ganz patent discloses a patentable invention over the prior art. In the preamble to the patent it is stated: "The invention relates to the packaging of cans and the like in wrap-around paperboard carriers." In Claim 4 of the patent it is stated the machine involved is "a machine for applying to cans and the like arranged in rows, a wrap-around carton * * *." Claim 4 then calls for a means of producing three manipulations in relation to the carton: (1) folding the pivotal catch panel relative to the associated closure panel; (2) engaging the pivotal catch through the latch opening; and (3) swinging the pivotal catch into substantially the plane of the folded closure panels. Since, as heretofore noted, the patent does not particularly point out and distinctly claim the feature of tightening, the three manipulations made by the machine in connection with wrap-around packaging are what are involved in connection with the prior art patents. Heybach Patent No. 995,965, Banta Patent No. 2,305,130, German Patent No. 598,010, Wood Patent No. 2,625,778, Monroe Patent No. 2,780,900 and Tobey Patent No. 2,823,501 all disclose machines adapted to close and lock folding cartons, the cartons having a closing and locking structure which includes a pivotal catch which is adapted to be folded relative to the closure panel to which it is attached, then inserted through an opening in the other overlapping closure panel, and then swung into substantially the plane of the folded closure panels. The machines disclosed automatically perform the described steps. The language in Claim 4 of the Ganz patent relating to a wrap-around carton for cans "arranged in rows", or similar language, does not appear in the prior art patents referred to. The manipulations necessary to close and lock a carton, whether it is a wrap-around or nonwrap-around operation, would seem to be very closely related. In both instances the manipulations result in tabs being inserted into openings so as to close and lock the carton containing the cans or other containers. The locking structures employed in connection with wrap-around cartons and nonwrap-around cartons are very similar in the matter of manipulations. In view of the close relationship between the matters referred to, it would seem to be merely a matter of option and design on the part of those having ordinary skill in the art to adapt the Ganz machine to handle a wrap-around carton. It would seem that Claim 4 describes in machine terms nothing more than the functions and operations required to manually manipulate and lock cartons of the wrap-around type. It is to be noted that Lane Patent No. 1,624,-257, Monroe Patent No. 2,780,900, Tobey Patent No. 2,823,501 and Wood Patent No. 2,625,778 disclose machines for folding cartons by means of stationary parts which is a feature of the Ganz machine. It was heretofore noted that Anness Patent No. 2,817,197, Arneson Patent No. 2,860,461 and Murray Patent No. 2,953,-879 all relate to machines designed for wrap-around packaging and that the defendant contends that the machines disclosed by those patents are not pertinent, among other reasons, for the reason they are directed to the use of glue in packaging. While the Ganz machine is not directed to the use of glue in packaging, in the preamble to the Ganz patent it is stated that the pivotal catch of the Weiss carton patent could be secured "after locking either by a tongue attached to the latching flap or by gluing the latching flap directly, or both."

Since the feature of tightening was not particularly pointed out and distinctly claimed in Claim 4 of the Ganz patent, it is clear that so far as patentable invention is involved the Ganz patent has to start or fall by the manipulations accomplished by means of stationary swords and guides in relation to a carton of the type set forth in the patent. It is the finding of the Court that such does not reach the level of patentable invention.

25. In the Weiss patent, different from the Ganz patent, the feature of

tightening is particularly pointed out and distinctly claimed.

It is clear that the heart of the claimed patentable invention is that the structure of the Weiss carton is such that a tightening effect may be achieved by means of a rotary latching action. In the specification it is stated that such rotary latching action can "if desired" produce an automatic tightening of the package as it cams or levers the closure panels into fully closed overlapping position. In the cross-examination of A. J. Weiss, certain questions were directed to him as to the matter just referred to. Some of those questions and his answers thereto were as follows:

"Q * * * My question has to do with the action of the locking structure in producing the tightness. As I read that sentence it says that the rotary latching can if desired produce an automatic tightening, and I am asking you if that does not imply that the rotary-latching action can be used without producing an automatic tightening?

"A I would have to agree it does.

"Q Now I ask you how can the rotary latching be used without producing a tightening action?

"A By the dimensions of it, perhaps.

"Q Would you be more specific on that point?

"A Well, if I foreshorten dimensions in the bottom closure panels or increase them—as the case may be— I can make a loose closure or a tight closure with the rotary-latching action."

It appears that the locking structure in the Weiss carton may or may not produce a carton-tightening action, depending upon the spatial relationship of the overlapping panels at the time that carton lock structure is pivoted. If the pivotal axis of the lock structure is positioned inwardly beyond the lock-engaged edge of the opening in which the catch is received no tightening will result, but if the pivotal axis is positioned outwardly of that edge tightening action will result.

It was the testimony of witnesses for the defendant that in packaging a Weiss carton by the rotary action a 1/32nd of an inch of tightening may be achieved.

A. J. Weiss testified that the individual features of his locking arrangement were disclosed in the different prior art cartons. He further testified that he did not know of any wrap-around carton in which those individual features were combined as they were in his locking arrangement.

The prior art patents introduced into evidence in connection with the Weiss patent by the plaintiffs were twenty in number. Eleven of those patents related to folding cartons and boxes; six to wrap-around cartons; and three related to envelope fasteners, fruit basket liners, and disintegrated pots.

It is the contention of the plaintiffs that the cartons shown in Morrison Patent No. 1,104,821, Close Patent No. 1,669,454, Trogman Patent No. 2,102,497, Pergande Patent No. 2,060,240, Poe Patent No. 2,316,362, Crary Patent No. 2,-419,391, French Patent No. 1,063,058 and Kells Patent No. 2,572,159 all would exhibit a tightening effect if appropriately manipulated. Further, it is their contention that the Robertson Paper Box and the Ray Paper Box cartons referred to would exhibit the tightening effect if appropriately manipulated. Further, it is their contention that the tightening effect is an inherent character of the prior art cartons referred to.

The defendant controverts those contentions of the plaintiffs. In that connection it also asserts that the cartons referred to were closed-end cartons as contrasted with the open-end of the Weiss carton. The plaintiffs contend that whether the cartons referred to are of the open-end or closed-end type is not of significance. It is the contention of the defendant that the tightening

action, if any, which might be embodied in the prior art cartons relied on by the plaintiffs occurs as an incident to accomplishing the locks thereof and serves no usual purpose and may be undesirable. It points out that in none of those patents is there any direct reference made to the matter of tightening.

26. The prior art patents relating to wrap-around cartons were directed to closed-end rather than wrap-around cartons. There appears to be nothing in the Weiss patent which excludes closed-end cartons. Both closed-end and open wrap-around cartons were well known in the art prior to the Weiss patent.

Both the Ray Paper Box and the Robertson Paper Box in 1951 and 1954 made and sold wrap-around cartons which appear to be somewhat similar to the Weiss carton. In the packaging of containers in those cartons the product was placed on the flat carton blank and the carton blank was then folded or wrapped around the product with the overlapping outer closure panels locked in place by means of a structure similar to that of the Weiss carton.

Four of the six wrap-around prior art patents—Gentry No. 2,786,572, Gentry No. 2,827,165, Andre No. 2,911,096, and Stone No. 2,975,891—relate to cartons held together by punch locks. One of the wrap-around patents—Grinspoon No. 2,798,603—relates to cartons held together by tuck flaps. One of the wrap-around patents—Currivan No. 2,922,561 —relates to cartons held together by glue. The six following carton prior art patents —Trogman No. 2,102,497, Morrison No. 1,104,821, Pergande No. 2,060,240, Poe No. 2,316,362, Crary No. 2,419,391 and Lighter No. 2,395,558—teach the use of overlapping panels, matching tongues, and openings in cartons which enclose their contents on all sides. In this connection the defendant in its brief states:

"These prior art patents relating to wrap-around cartons are enlightening evidence of the state of the pertinent art, and confirm the novelty and patentability of the Weiss combination. These patents demonstrate, as Weiss testified, that wrap-around cartons having the general characteristics of his carton, but with different locking arrangements, were old and well known. But, more importantly, they show a high degree of activity in the field of wrap-around carriers during the four years immediately preceding the Weiss invention, and demonstrate that before Weiss, nobody had thought of the idea of using the Weiss locking arrangement to produce a tightening action in a wrap-around carton. This remained for Weiss to invent * * *."

27. The patentable invention claimed is, as noted, a combination of old elements. While numerous patents involving a combination of old elements have been held invalid, yet it is possible for a combination of old elements to give rise to patentable invention. In the case of Copease Manufacturing Co. v. Cormac Photocopy Corporation (D.C.S.D.N.Y. 1965), 242 F.Supp. 993, this Court upheld the validity of a patent based on a combination of old elements.

Section 103, Title 35 U.S.C.A., provides:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. * * *."

In the recent cases of Graham v. John Deere Plow Co. (1966), 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, and United States v. Adams (1966), 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572, the Supreme

Court has considered and restated the principles applicable to patentability.

In the case of Graham v. John Deere Plow Co., supra, the Court stated (pp. 17–18 of 383 U.S. p. 694 of 86 S.Ct.):

" * * * Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. * * * "

Prior to the conception of the Weiss carton there were cartons which met and have continued to meet the needs and wants of numerous users of wrap-around cartons. However, they had not met the needs and wants of other users. In the case of the Weiss carton, by means of a rotary latching action during the packaging operation, a tightening of the completed package up to ½nd of an inch is or can be brought about. Some users desire such tightening action.

28. The tightening effect in the Weiss carton packaging produced by rotary latching action represents a moderate but nevertheless commercially worth-while advance in the field of wrap-around packaging.

It is a close and troublesome question whether that advance amounted to patentable invention. That advance was made by combining certain well-known carton locking structures with a rotary latching action. It is the view of the Court that in light of all the prior art that advance was not such as to have been nonobvious to a person having ordinary skill in the art.

It is the finding of the Court that at the time the Weiss patent was obtained the differences between the subject matter of that patent and the prior art were such that the subject matter of the Weiss patent as a whole would have been obvious at the time to a person having ordinary skill in the art.

29. There is another issue between the parties. It is the contention of the plaintiffs that the defendant, Continental Can Company, Inc., was guilty of a violation of the anti-trust laws in connection with the Weiss carton patent and for that reason it may not enforce that patent.

It was heretofore noted that on January 18, 1962, the defendant, Continental Can Company, Inc., and the Federal Paper Board Company entered into an agreement covering a number of matters. In the agreement Continental granted Federal a license, but without the right to grant sub-licenses, for Weiss cartons. That license was to be exclusive, save as to Continental and its subsidiaries. After the execution of that agreement, both Continental and Federal sold cartons to their respective customers.

The agreement contained no provision for the granting of additional licenses. It is the contention of the plaintiffs that in practice the parties did exercise joint control over the granting of additional licenses and in connection therewith gave Federal what amounted to a veto power in connection with the granting of additional licenses.

In support of their contention, the plaintiffs cite and quote, as hereinafter set forth, from the case of United States v. Crown Zellerbach Corporation (D.C. 1956), 141 F.Supp. 118, p. 127 in which it is stated:

" * * * Here * * * it is alleged that the patentee ALSCO had agreed to confer with Crown before appointing as a distributor any paper jobber in the territory east of the Mississippi. The understanding fairly implied is that Crown's wishes will be given consideration. By serving the

interests of Crown and not of ALSCO, the agreement presents a genuine and triable issue under the Sherman Act. In analogous circumstances, it has been held that an agreement by the patentee giving the licensee a veto power in the selection of additional licensees is invalid. * * * "

The plaintiffs also cite and rely on the case of United States v. Besser Manufacturing Co. (D.C.1951), 96 F.Supp. 304, affirmed (1952), 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063. That case was a civil action by the United States under the Sherman Act against a number of defendants. There were a number of issues in the case, one of which had to do with the licensing of certain patents. In that case two of the defendants, Besser Manufacturing Company, referred to as Besser, and Stearns Manufacturing Company, referred to as Stearns, entered into an agreement with one Gelbman and one Andrus, the patentees of certain patents, under which Besser and Stearns became the exclusive licensees of the patents. The agreement provided for the granting of additional licenses only by joint consent. In that case, in the District Court opinion, it is stated (96 F.Supp. p. 310):

"Granting that an exclusive license may be valid * * *, the Supreme Court has recognized certain limitations, and where such a license has for its purpose the suppressing of competition, it has been held invalid.

* * *

"We believe that the contract under question goes further than is necessary to protect the patent monopoly of Gelbman and Andrus. It may well be that an exclusive license to one party would be valid, but here the patentees have joined hands with the two largest competitors in the industry and by terms of their agreement have virtually made it impossible for others to obtain rights under those patents. The contract even gives Stearns and Besser the power to restrict competition—present and future—by requiring their joint consent before licensing others. It is this combination requiring collective action that primarily invalidates the agreement. We believe it clear that the parties intended this contract to be a means whereby control of the industry could be acquired and competition eliminated. * * * "

The exclusive license feature of the agreement here in question soon gave rise to difficulties for Continental. It had numerous customers who were large users of the Weiss cartons. Some of those customers claimed that an additional source of supply was needed to satisfactorily meet their needs and requested that additional licenses be granted to meet that situation. There were numerous conferences between Continental and Federal in connection with the matter of granting additional licenses. In some instances Continental, after conferring with Federal, granted additional licenses with the consent of Federal. In some instances Continental granted additional licenses without the consent of Federal. If Continental did not grant additional licenses to afford some of its major carton customers a second source of supply, there was the possibility of losing those customers. The granting of such licenses without the consent of Federal exposed it to liability to Federal for breach of the license agreement.

The situation in regard to the granting of additional licenses became increasingly unsatisfactory. To deal with that situation, Continental and Federal on December 16, 1963, entered into an agreement amending their previous agreement. Under the agreement as amended, Continental was given the right to grant additional licenses to third parties to supply Weiss cartons to companies for whom Continental was the major supplier of such cartons.

It was heretofore noted that in the cases relied on by the plaintiffs the agreements in those cases were regarded as having for their objective the suppressing of competition in violation of the anti-trust laws.

In the present case it does not appear that neither Continental nor Federal in their handling of requests for the licensing of third parties before their agreement was amended had as their objective the suppressing of competition or did suppress competition. In fact, it would appear that their handling of them made for greater competition.

■ It is the finding of the Court that the conduct of Continental and Federal in connection with the matter of dealing with requests for additional licenses did not contravene the anti-trust laws or constitute misuse of the Weiss patent.

30. In connection with the agreement of June 18, 1962, between Continental and Federal, the plaintiffs make an additional contention. They contend that the provisions of the agreement relating to the licensing of improvements constituted a violation of the anti-trust laws. Continental was the owner of the Weiss and Ganz patents. Federal was the owner of a patent comprising a machine referred to as the Mor-Can-Pak machine. Paragraph 3 of the agreement is as follows:

"3. CONTINENTAL agrees that it will sell to FEDERAL such JAK-ET-PAK machines as FEDERAL shall order. The machines so sold shall include any improvements then incorporated in the then current JAK-ET-PAK machines of the series ordered."

Paragraph 6 of the agreement is as follows:

"6. FEDERAL agrees that it will sell to CONTINENTAL such MOR-CAN-PAK machines as CONTINENTAL shall order. The machines so sold shall include any improvements then incorporated in the then current MOR-CAN-PAK machines of the series ordered."

Paragraph 9 of the agreement provides, in part:

"9. CONTINENTAL hereby grants to FEDERAL a license * * * under CONTINENTAL'S within described

Patent Rights, patents and patent applications * * * to manufacture and sell Cartons throughout the United States for use on JAK-ET-PAK machines and MOR-CAN-PAK machines. * * *."

Paragraph 11 of the agreement provides, in part, as follows:

"11. FEDERAL hereby grants to CONTINENTAL a license * * * under FEDERAL'S within described Patent Rights, patents and patent applications to manufacture and sell Cartons throughout the United States for use on JAK-ET-PAK machines and MOR-CAN-PAK machines. * *."

Paragraph 19 of the agreement, which is the provision relied on by the plaintiffs in support of their contentions, provides, in part, as follows:

"19. (a) If and when either of the parties hereafter develops or acquires an Improvement of a patentable nature, it will promptly make a full disclosure of the same to the other party and as to the actual cost incurred by it in developing or acquiring the Improvement. The other party shall then have a period of 45 days in which to decide whether it wishes to acquire from the first party a royalty-free license * * * which shall be for the term of the patent * * * covering such rights as the first party may have in the Improvement in return for sharing one-half said cost. If it decides that it wishes to acquire the license it shall within said period so advise the first party and pay to the first party its share of said cost, whereupon the license on that particular Improvement shall become effective.

" * * *."

Paragraph 22 of the agreement provides, in part, as follows:

"22. (c) The term 'Improvement' as used herein means (1) any modification of the Cartons or Carton applying machines; or (2) any modification of inventions which are within the scope of the Patent Rights. * *

"(d) The term 'Patent Rights' as used herein means (1) all issued United States patents now owned or controlled by either party relating to Cartons and Carton applying machines; (2) all pending applications for United States patents now owned or controlled by either party relating to Cartons and Carton applying machines; and (3) all United States patents which may issue on said pending applications or for any other inventions which either party has heretofore made or acquired relating to Cartons and Carton apply- ing machines, which applications or patents may be made or acquired by either party after the date of this Agreement to the extent that the ac- quiring party has the right to grant licenses thereunder.

" * * * "

Paragraph 21 of the agreement pro- vides, in part, as follows:

"21. Either party may terminate its obligations under Paragraph 19 hereof as to any future Improvement made or acquired by it, on the fifth anniversary of the date of this Agree- ment or on any anniversary thereafter, by giving the other party six (6) months' advance notice in writing of its decision to terminate. * * * "

The plaintiffs, in support of their con- tentions, rely on a number of cases. They cite the case of United States v. Associat- ed Patents, Inc. (D.C.1955), 134 F.Supp. 74, affirmed Mac Inv. Co. v. United States (1956), 350 U.S. 960, 76 S.Ct. 432, 100 L.Ed. 834. They set out the following quotation from the District Court opinion in that case (p. 82 of 134 F.Supp.):

"2. The API agreement of August 3, 1933, created an arrangement for the exclusive cross-licensing of the subject matter patents and future im- provement patents therein through the pooling of these patents in API. The combined effect of the provisions of the API agreement was to impose the following unreasonable restraints:

"(a) * * *

"(b) Outside parties were restricted in their manufacture of machine tools by being foreclosed from obtaining li- censes on the subject matter patents or improvements thereon for any of the types of machine tools included within the fields of use exclusively re- served to API members.

"(c) Each of the parties was re- stricted in the licensing of improvement patents it developed by the require- ments that all improvement patents be assigned to API.

"(d) Invention and technological de- velopment have been discouraged by the limitations imposed on the mem- bers' rights to use and license improve- ment patents developed by them."

They also cite and quote from the opinion in the case of International Nickel Company v. Ford Motor Company (D.C.1958), 166 F.Supp. 551, 565:

"That license-back provisions are not illegal *per se* was established beyond cavil by Transparent-Wrap Machine Corp. v. Stokes & Smith Co., 1947, 329 U.S. 637, 67 S.Ct. 610, 91 L.Ed. 563. True it is, that license agreements will not be upheld where they are used in violation of the anti-trust laws to perpetuate control over an industry long after the expiration of the basic patents or where 'through * * * patent pools or multiple licensing agree- ments the fruits of invention of an entire industry might be systemati- cally funneled into the hands of the original patentee.' Similarly such agreements which tend to stifle re- search are antagonistic to the under- lying policies of the patent laws."

They also cite and quote from the opinion in the case of United States v. Besser Manufacturing Company, supra (p. 311 of 96 F.Supp.):

"Still these contracts go further. The intent to restrain trade and the il- legality is further augmented and evi-

denced by the provision in both the four-way agreement of 1942 and the Flam purchase contract granting exclusive rights to Besser and Stearns of all improvements to the existing patents and to inventions still unborn. Such conditions while not illegal, per se, cannot be justified as necessary to the enjoyment of or ancillary to the patent rights conveyed, United States v. National Lead Co., D.C., 63 F.Supp. 513, 524; United States v. General Electric Co., D.C., 80 F.Supp. 989, 1005; Transparent Wrap Machine Corp. v. Stokes & Smith Co., 329 U.S. 637, 67 S.Ct. 610, 91 L.Ed. 563, and read in conjunction with the rest of the contract provisions and other acts herein enumerated, makes the conclusion inescapable that the Besser-Stearns group had and achieved an obvious objective that cannot be reconciled with the restrictions of the Sherman Anti-Trust Act."

The defendant, in opposition to the contention of the plaintiffs, relies upon the case of Transparent-Wrap Machine Corp. v. Stokes & Smith Co. (1947), 329 U.S. 637, 67 S.Ct. 610, 91 L.Ed. 563. In that case there was under challenge under the anti-trust laws a patent license agreement. In that case the Transwrap Corporation was the owner of a patent on a machine which filled and wrapped certain articles. It entered into a patent license agreement with the Stokes & Smith Company under which it licensed the latter to manufacture and sell the patented machine. The contract provided that the licensee assign to the licensor any improvement patents applicable to the machine and suitable for use in connection with it. The licensor sought to enforce that provision. The licensee contended that the provision in question was illegal and unenforceable under the anti-trust laws. In a 5 to 4 decision the Supreme Court held as follows (p. 648 of 329 U.S. p. 616 of 67 S.Ct.): "We only hold that the inclusion in the license of the condition requiring the licensee to assign improvement patents is not *per se* illegal and unenforceable."

In one provision of the agreement involved in that case it was provided that if the licensee "shall discover or invent an improvement which is applicable to the Transwrap Packaging Machine and suitable for use in connection therewith" it would submit the same to the licensor which might at its option apply for Letters Patent covering the same, and if the licensor failed to apply for such Letters Patent the licensee might do so. It was also provided that during the term of the license all improvement patents, whether secured by the licensor or licensee, were to be included in the terms of the license without payment of an additional royalty. The plaintiffs in their brief herein state as follows:

"* * * Paragraph 19 provides that if at *any time* in the future either of the parties makes or acquires any patentable development in the field of wrap-around packaging the other party can obtain a *royalty-free exclusive* license thereunder by paying half of the development or acquisition costs. This is nothing more or less than a patent pool without time limitation. It provides in effect, as between these two competitors, that if either one ever develops or acquires something of value in the packaging field, it must share it fifty-fifty with the other party *and with no one else.*

"Not only does this destroy competition as between these two competitors with regard to things in being; competition is also destroyed in research and development for the future. In addition the future inventions are to be shared between these two concerns to the exclusion of all others."

The parties are in disagreement as to the extent the parties had and were making use of the provisions in their agreement as to future developments. Some, but not a great deal, use was made of those provisions but those provisions are apparently regarded by the parties as being operative.

Paragraph 23 of the agreement between Continental and Federal provides

that the agreement shall be for five years with right of extension from year to year. Other provisions in that paragraph make it clear that it was not the intent of the parties to extend the provisions of the agreement beyond the patent period of the patents involved. Thus, the provisions relating to future developments in connection with the patents involved would be limited to the life of those patents. Thus, it cannot be said that the provisions as to future developments in connection with the Weiss and Ganz patents are unlimited as to time.

It was previously noted that in the case of Transparent-Wrap Machine Corp. v. Stokes & Smith Co., supra, the Supreme Court held that a provision in a license agreement which required the assignment of future development patents was not per se illegal and unenforceable.

■ In the present case there is absent any showing that the provisions in the agreement between Continental and Federal relating to future development patents had any anti-competitive effect or resulted in the stifling of any research. Thus, the contentions of the plaintiffs as to illegality and unenforceability of those provisions have to be based upon the provisions per se.

While the holding of the Supreme Court that a condition in a license agreement requiring the assignment of future development patents is not per se illegal and unenforceable was a 5 to 4 decision, it apparently is still the law.

It is the view of the Court that the contentions of the plaintiffs as to the illegality and unenforceability of the Weiss and Ganz patents because of the situation as to future development patents are not well founded.

■ 31. The plaintiffs contend that the rights of the defendant under the Weiss patent are unenforceable for another reason. In that connection it is the contention of the plaintiffs that fraud was practiced on the Patent Office in connection with the securing of the Weiss patent. It appears that during the prosecution of the Weiss application the Patent Office cited certain references. It is the contention of the plaintiffs that arguments were made in behalf of the applicant differentiating those references and that such arguments were false and that they were known to be false at the time they were made. The Patent Office examiner had before him the prior art references and formed his own views as to what they disclosed. It is the finding of the Court that no deception was practiced by Weiss or by the defendant acting in his behalf in connection with the prosecution of the Weiss application.

■ 32. The plaintiffs, as heretofore noted have asked for an allowance of attorneys' fees under the provisions of Section 285, Title 35 U.S.C.A. This case involved numerous important and difficult questions in the field of patent law, some of which were close and troublesome. The Court is of the view and holds that this is not such an exceptional case as to justify the allowance of attorneys' fees.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter of this action and the parties thereto.

■ 2. Claim 4 of Ganz Patent No. 2,986,857 is invalid in that it does not particularly point out the invention claimed as required by the provisions of Section 112, Title 35 U.S.C.A.

3. Claim 4 of Ganz Patent No. 2,986,857 is invalid as lacking in invention under Section 103, Title 35 U.S.C.A.

■ 4. Claims 1, 2 and 4 of Weiss Patent No. 2,990,997 are invalid as lacking in invention under Section 103, Title 35 U.S.C.A.

5. Any rights the defendant might have under Weiss Patent No. 2,990,997 are unenforceable under Section 135(c), Title 35 U.S.C.A.

6. The defendant has not been guilty of the violation of the anti-trust laws of the United States in connection with

the Weiss and Ganz patents or any misuse of those patents.

7. No fraud was practiced on the Patent Office in the prosecution of the application of the Weiss patent.

8. The counterclaim of the defendant should be dismissed with prejudice.

9. No allowance of attorneys' fees should be made to the plaintiffs.

10. The plaintiffs are entitled to have taxed herein against the defendant their taxable costs and disbursements.

ORDER FOR JUDGMENT

It is hereby ordered that judgment shall be entered:

1. Adjudging and declaring that Claim 4 of United States Letters Patent No. 2,986,857 issued on June 6, 1961, to H. Ganz is invalid.

2. Adjudging and declaring that Claims 1, 2 and 4 of United States Letters Patent No. 2,990,997 issued on July 4, 1961, to A. J. Weiss are invalid.

3. Adjudging and declaring that whatever rights the defendant might have under United States Letters Patent No. 2,990,997 issued on July 4, 1961, to A. J. Weiss are not enforceable.

4. Adjudging and declaring that the defendant has not been guilty of the violation of the anti-trust laws of the United States in connection with the Weiss and Ganz patents or any misuse of those patents.

5. Adjudging and declaring that no fraud was committed on the Patent Office in the prosecution of the Weiss application.

6. Dismissing the defendant's counter claim with prejudice.

7. Denying the claim of the plaintiffs for an allowance of attorneys' fees.

8. Assessing the taxable costs and disbursements of the plaintiffs against the defendant.

It is further ordered that this Memorandum shall constitute the Findings of Fact and Conclusions of Law in this case.