**MOOG, INC., Plaintiff,**

v.

**PEGASUS LABORATORIES, INC.,
Defendant.**

**Civ. A. No. 30888.**

United States District Court,
E. D. Michigan, S. D.

June 26, 1973.

Alfonse J. D'Amico, Barnes, Kisselle, Raisch & Choate, Detroit, Mich., Ken-

neth R. Sommer, Buffalo, N. Y., for plaintiff.

Dale R. Small, Whittemore, Hulbert & Belknap, Detroit, Mich., Wm. L. Mathis, Joel M. Freed, Burns, Doane, Swecker & Mathis, Washington, D. C., Andrew J. Beck, Milwaukee, Wis., for defendant.

## MEMORANDUM OPINION

FEIKENS, District Judge.

Defendant, Pegasus Laboratories, Inc., brings a motion for summary judgment saying plaintiff Moog's patent is unenforceable for failure to comply with 35 U.S.C. § 135(c). Plaintiff resists this motion on a number of grounds.

There has been protracted litigation of a closely related matter in the Western District of New York. Counsel have supplied this court with the record made in that case. Abex Corp. v. Moog, Inc., Action No. 1967–111. Counsel have also indicated the portions of that voluminous record which must be considered in reaching a decision in the instant matter. For the purposes of this motion, the court adopts the relevant findings of fact proposed by Moog in the New York proceeding. Thus, this court views the facts in a light most favorable to the respondent. Moog's proposed findings of fact are as follows:

On May 25, 1955, Martin P. Wolpin et al. filed in the United States Patent Office an application (Serial No. 511,088) disclosing a dry motor type electrohydraulic servovalve in which the electrical section is isolated from the hydraulic section by a flexible disc backed up by a knife-edge, the original claims being limited to this "flexible disc" element. The application was assigned to Bell Aerospace Corporation (hereinafter Bell).

On January 23, 1956, William C. Moog, Jr. filed in the United States Patent Office an application (Serial No. 560,573) disclosing a dry motor type electrohydraulic servovalve in which the electrical section is isolated from the hydraulic section by a "flexure tube" or "sleeve member" to which element the original claims were limited. The application was assigned to Moog Servocontrols, Inc., now by change of name to Moog, Inc., the present plaintiff.

On April 12, 1957, J. D. Buchanan filed in the United States Patent Office an application (Serial No. 652,489) disclosing a dry motor type electrohydraulic servovalve in which the electrical section is isolated from the hydraulic section by a "flexible tube" to which element the original claims were limited. The application was assigned to Bell.

In September and October of 1959, the Patent Office suggested two claims to Wolpin et al. and Moog for purpose of interference, one calling for a "flexible member" and the other for a "flexure member," and stated that a failure to make these claims would constitute a disclaimer of the subject matter involved.

Both Wolpin et al. and Moog copied the two suggested claims into their respective applications.

On December 22, 1959, the Patent Office declared Interference No. 90,770 between the Moog and Wolpin et al. applications on the basis of the copied suggested claims.

On August 6, 1962, the Patent Office declared Interference No. 92,963 between the Buchanan and Moog applications on the basis of two claims, one calling for a "flexible spring metal tube" and the other for a "flexible tube," which Bell had proposed as counts in Interference No. 90,770 and also copied into the Buchanan application to provoke this separate Interference No. 92,-963. Before Interference No. 92,963 was declared, Moog had copied into his application the two claims proposed by Bell, and Buchanan had copied into his application three claims suggested by the Patent Office which were identical with claims 10, 12 and 15 already in the Moog application and each calling for a "flexure tube."

On November 18, 1962, the Patent Office gave notice to the parties to both

Interferences of 35 U.S.C. § 135(c), requiring the filing in the Patent Office of a copy of any agreement "in connection with or in contemplation of the termination of the interference."

In prospective contemplation of settling Interference No. 90,770 (Moog v. Wolpin, et al.), Moog and Bell entered into a written agreement dated August 21, 1964. By the terms of this agreement, Moog and Bell established a formal settlement procedure providing for:

a. An exchange of proofs of inventorship between the parties to determine which party would be entitled to an award of priority;

b. If the parties were unable to determine which party would be entitled to an award of priority within six months from the date of the agreement, the interference would be resumed in the Patent Office; and

c. The party found not to be entitled to the award of priority agreed to promptly file a concession of priority. In addition, the parties granted to each other non-exclusive paid-up cross-licenses under their respective applications. Each license granted the other party the right to sub-license others.

On the same day, August 21, 1964, Moog and Bell entered into a separate written agreement in prospective contemplation of settling Interference No. 92,963 (Buchanan v. Moog). This agreement established the same formal procedure for exchanging proofs of inventorship between the parties, submitting the dispute to the Patent Office if unresolved six months thereafter, and providing for the concession of priority to the party found to be the first inventor. The parties also cross-granted non-exclusive paid-up licenses under their respective applications which contained the right to sub-license others.

Both of the patent interference settlement agreements of August 21, 1964, represented the complete understanding between Moog and Bell at the time.

Both agreements of August 21, 1964, between Moog and Bell [Interference No. 90,770 (Moog v. Wolpin, et al.); Interference No. 92,963 (Buchanan v. Moog)] were promptly filed in the Patent Office on August 27, 1964, less than a week after their execution. Each agreement was forwarded to the Patent Office by a letter of transmittal jointly signed by the attorneys for the parties. Receipt of each agreement was acknowledged by the Patent Office by a separate letter, copy of which along with the agreement and its letter of transmittal were placed by the Patent Office in the respective interference file.

Pursuant to the formal procedure established in the agreements of August 21, 1964, the respective attorneys for the parties simultaneously exchanged proofs of inventorship by mail on February 10, 1965. The exchanged proofs comprised documents tending to establish the respective dates of invention.

On March 1, 1965, the attorneys representing Wolpin et al. in Interference No. 90,770 filed a letter in the Patent Office reporting that the parties had exchanged proofs and had determined Wolpin et al. to be the first inventor and entitled to the award of priority. The letter also reported that Moog would file a concession of priority to Wolpin, et al.

On March 4, 1965, the attorneys for Buchanan in Interference No. 92,963 filed a letter in the Patent Office reporting that the parties had exchanged proofs and that it had been determined that Moog was the first inventor. The letter also reported that Buchanan's concession of priority to Moog was being prepared.

On March 4, 1965, Moog's concession of priority was filed in the Patent Office, conceding Wolpin et al. to be the first inventor in Interference No. 90,770 (servovalve including the "flexure member" element).

On March 5, 1965, Buchanan's concession of priority was filed in the Patent Office, conceding Moog to be the first inventor in Interference No. 92,963 (servovalve including the "flexure tube" element).

On March 16, 1965, Moog and Bell entered into two similar supplemental agreements, one relating to the Wolpin et al. and Moog applications, and the other relating to the Buchanan and Moog applications. By the terms of these supplemental agreements:

a. The parties revoked the cross-right to sub-license others granted by the settlement agreements of August 21, 1964, and

b. Both the settlement agreements and the supplemental agreements were made to be binding upon and to inure to the benefit of successors of each party.

On May 11, 1965, the Patent Office Board of Patent Interferences acknowledged the filing and sufficiency of the concession of priority filed by Moog in Interference No. 90,770.

On May 11, 1965, the Patent Office Board of Patent Interferences notified the parties of the filing and sufficiency of Buchanan's concession of priority to Moog in Interference No. 92,963.

Moog having conceded priority to Wolpin et al. the Wolpin et al. application in Interference No. 90,770 issued on October 5, 1965, as U.S. Patent No. 3,209,782, containing not only broad claims reciting "flexure member" (claims 11, 14) and "flexible member" (claims 10, 12, 13), but also the narrower and only claims asked for before this Interference was declared limited to "flexible disc" (claims 1–7) and "diaphragm" (claims 8, 9).

Buchanan having conceded priority to Moog in Interference No. 92,963, Buchanan Patent No. 3,221,760 issued on December 7, 1965, containing only two claims asked for before this Interference was declared and limited to the armature having a "bore" into which the flexible tube fitted, a structural feature not disclosed in the Moog application.

Buchanan having conceded priority to Moog, the same Moog application involved in both Interferences Nos. 90,770 and 92,963 issued on January 11, 1966, containing the identical claims limited to "flexure tube" (claims 1–11) that had been asked for before either Interference was declared, as well as other more limited claims (claims 12–18).

On May 2, 1966, the attorneys for Wolpin et al. under cover of a letter of transmittal identifying Interference No. 90,770, submitted to the Patent Office without previous knowledge of Moog's attorney a copy of that one of the supplemental agreements of March 16, 1965, which related to the Wolpin et al. and Moog applications, both such letters of transmittal and supplemental agreement being placed by the Patent Office in the file of Interference No. 90,770.

On the same date, May 2, 1966, the same attorneys now representing Buchanan, under cover of a letter of transmittal identifying Interference No. 92,963, submitted to the Patent Office without previous knowledge of Moog's attorney a copy of the same supplemental agreement, instead of the other one relating to the Buchanan and Moog applications, both such letter of transmittal and the actually submitted wrong supplemental agreement being placed by the Patent Office in the file of the Interference No. 92,963.

On May 27, 1966, by letter, copy of which was placed in the file of Interference No. 90,770, the Patent Office acknowledged filing of the appropriate supplemental agreement on May 2, 1966, but stated that no action could be taken because it was filed subsequent to termination of the interference.

On the same date, May 27, 1966, by separate letter, copy of which was placed in the file of Interference No. 92,963, the Patent Office acknowledged filing of the wrong supplemental agreement on May 2, 1966, but stated that no action could be taken because it was filed subsequent to termination of the interference.

On December 19, 1966, the attorney for Moog, under cover of an explanatory letter of transmittal identifying Interference No. 92,963 and captioned "Correction of Obvious Inadvertence in Record of Above Interference," submit-

ted to the Patent Office with previous knowledge of Buchanan's attorney a copy of the correct supplemental agreement which related to the Buchanan and Moog applications, both such letter of transmittal and correct supplemental agreement being placed by the Patent Office in the file of Interference No. 92,963.

On January 5, 1967, by letter, copy of which was placed in the file of Interference No. 92,963, the Patent Office acknowledged filing of the correct supplemental agreement on December 19, 1966, but stated that no action could be taken since it was filed subsequent to termination of the interference.

■ Initially, this court must dispose of a threshold contention. Moog argues that Pegasus failed to affirmatively plead the defense of unenforceability as required by 35 U.S.C. § 282, and thus is barred from asserting it now. Pegasus insists its answer and counterclaim for declaratory relief satisfy this requirement. This court is inclined to adopt defendant's position primarily because "[a]ffirmative defenses are required to be pleaded to prevent surprise." Huszar v. Cincinnati Chemical Works, Inc., 172 F.2d 6, 9 (6th Cir. 1949). In view of the lengthy history of this cause, Moog cannot argue surprise.

■ Nevertheless, this court does not rest its decision on a liberal reading of Section 282 but rather grants Pegasus' motion to amend its answer to incorporate in its summary judgment motion an affirmative defense of unenforceability. The discretion of this court to allow amendments must be liberally construed. F.R.Civ.P. 15. Indeed, the refusal to allow amendment might be an abuse of discretion. Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The absence of surprise eliminates the possibility that this late amendment will work an injustice upon Moog.

■ This court need not decide all the issues raised by Moog in opposition to summary judgment. Summary judgment must be denied because this court cannot say as a matter of law that unenforceability results from the failure of the parties to the interferences involved here to timely file the supplemental agreements. The sanction prescribed for failure to file under Section 135 is harsh—patent unenforceability. In view of the language of the statute as well as the congressional history, this court does not believe Congress intended unenforceability to result in all cases where parties failed to file supplemental agreements. Two examples come immediately to mind.

First, the statute is silent about supplemental agreements executed after official termination of an interference by the Patent Office. Assuming the six-month grace period is of no assistance, a cursory reading of the statute might lead to the conclusion that since no filing would be accepted by the Patent Office, unenforceability would result. We do not believe Congress intended such a result.

A second example, arguably applicable to the facts at bar, is where a supplemental agreement is merely incidental to the basic termination agreement. Where, for example, the parties execute a supplemental agreement correcting some figures or spellings in the original termination agreement, this court cannot believe Section 135(c) demands a forfeiture of a patent if such an incidental agreement is not timely filed.

The statute requires the filing of "[a]ny agreement or understanding . . . made in connection with or in contemplation of the termination of the interference." This language demands some definite link between the settlement of an interference and the agreement or understanding.

■ There are situations where the alterations may be so minor as to be practically unconnected with the termination. In other words, there is a distinction between the termination itself and the termination agreement. Where

a supplemental agreement is so substantial as to reach back and alter the termination of the interference, filing is required. But where the character of the supplemental agreement is such that it is merely incidental to the termination and, practically, it then only effects the termination agreement, the failure to file should not result in a forfeiture.

The legislative history supports this interpretation. The purpose of Section 135 is "to require the filing in the Patent Office of agreements settling patent interference proceedings." 1962 U.S. Code Cong. and Adm. News, 3286. The agreements which settled the interferences in the instant cause were the termination agreements of August 1964. The supplemental agreements provided for some modification. Unlike the termination agreements, they do not appear to fall within the definition of agreements "settling" an interference.

Moreover, the sum and substance of the legislative hearings as well as the congressional report is that Congress was seeking to check antitrust violations. Congress undoubtedly did not intend parties to an interference to have the option to decide whether or not a termination agreement had antitrust implications. Thus, if the instant case involved only the failure to file the termination agreements, notwithstanding the absence of antitrust allegations, the sanction of unenforceability would be appropriate. But where, as here, the unfiled agreements were supplemental, perhaps without antitrust implications and thus arguably merely incidental, the intent of Congress to impose forfeiture is questionable.

There is no allegation before this court that any actual prejudice resulted to anyone from the failure to file the supplemental agreements. Pegasus suggests in its brief that the supplemental agreements—particularly the revocation of licensing rights granted in the termination agreements—had potential antitrust implications and thus should have been filed.

Pegasus cites authority to this court that is not persuasive. In Esso Research and Engineering Co. v. Brenner, 165 U.S.P.Q. 486 (March 18, 1970), the parties to an interference inadvertently failed to file a settlement agreement. Plaintiff sought to compel the Commissioner of Patents to accept a filing four years after termination. The Commissioner declined and his decision was approved by the District Court and the Court of Appeals. If in the instant case there had been no timely filing of the termination agreements of August 21, 1964, the *Esso Research* case would be compelling. But since the termination agreements were filed in the instant case, the teaching of the Court of Appeals is inapplicable.

Similarly, Old Dominion Box Co. v. Continental Can Co., 273 F.Supp. 550 (S.D.N.Y.1967), affirmed, 393 F.2d 321 (2nd Cir. 1968), is distinguishable from this case. The District Court ruled that a "lengthy agreement" between the parties to an interference was made in contemplation of a termination, and thus the failure to file resulted in unenforceability of the patent. To begin with, the agreement in *Old Dominion* was analogous to the termination agreements in the instant case, and in *Old Dominion* there was no filing whatsoever. Moreover, the court reached its conclusion about the nature of the settlement agreement only after a full trial on the merits. As a result, *Old Dominion* is not helpful to Pegasus' position.

■ Consistent with the congressional intent to take away from the parties to an interference the option to pick and choose which of their termination agreements have antitrust implications and thus which they need to file, this court believes that all agreements, whether initial or supplemental, with actual or potential antitrust implications, must be filed in accordance with Section 135(c) or suffer the penalty of unenforceability. But where a supplemental agreement is such that it provides only inci-

dental modification to a termination agreement and there are no antitrust implications, real or potential, the failure to file under Section 135(c) should not result in the imposition of the penalty of unenforceability.

The determination of where the supplemental agreements at bar fit in the above interpretation is a mixed question of fact and law. This court is not prepared to declare Moog's patent unenforceable without presentation of further facts. Therefore, unless evidence on this issue will be presented at the trial on the merits, this court deems it advisable to hold a hearing to decide this question prior to trial. The determination of other grounds advanced by Moog in opposition to summary judgment are held in abeyance pending determination of this issue.

Counsel are instructed to notify this court by letter within fourteen (14) days whether this matter can be resolved by a preliminary evidentiary hearing or more expeditiously at trial of this cause.

An appropriate order may be submitted.