**MOOG, INC., Plaintiff,**

v.

**PEGASUS LABORATORIES, INC., Defendant.**

**Civ. A. No. 30888.**

United States District Court, E. D. Michigan, S. D.

May 7, 1974.

Alfonse J. D'Amico, Barnes, Kisselle, Raisch & Choate, Detroit, Mich., Kenneth R. Sommer, Buffalo, N.Y., for plaintiff.

Dale R. Small, Whitmore, Hulbert & Belknap, Detroit, Mich., Wm. L. Mathis, Joel M. Freed, Burns, Doane, Swecker & Mathis, Washington, D. C., Andrew J. Beck, Milwaukee, Wis., for defendant.

## SECOND MEMORANDUM OPINION

FEIKENS, District Judge.

This is an action by Moog, Inc., a New York corporation, against Pegasus Laboratories, Inc., a Michigan corporation, for infringement of United States Patent No. 3,228,423, issued on January 11, 1966 to Moog for a dry motor type electrohydraulic servovalve. Pegasus contends the patent is unenforceable for failure to comply with 35 U.S.C. § 135(c), which requires interference parties to file with the Patent Office a written copy of any "agreement or understanding" made "in connection with or in contemplation of the termination of the interference".[1]

A history of the interferences which preceded issuance of this patent is contained in the opinion of June 26, 1973, which was entered in this case.[1a] The parties had earlier agreed that the issue of unenforceability under section 135(c) was to be tried on the merits and that this hearing was to be given priority. The June 26 opinion made certain preliminary findings of fact and law; however, no final decision was reached.[2] Further discovery has been conducted and additional proofs submitted. Based upon this evidence and the accompanying briefs and oral argument, the defense of unenforceability can now be conclusively adjudicated.

The major problems involved in applying the provisions of subsection (c) to the facts of this case fall generally into two categories. First, there has

---

1. "Any agreement or understanding between parties to an interference, including any collateral agreements referred to therein, made in connection with or in contemplation of the termination of the interference, shall be in writing and a true copy thereof filed in the Patent Office before the termination of the interference as between the said parties to the agreement or understanding. If any party filing the same so requests, the copy shall be kept separate from the file of the interference, and made available only to Government agencies on written request, or to any person on a showing of good cause. Failure to file the copy of such agreement or understanding shall render permanently unenforceable such agreement or understanding and any patent of such parties involved in the interference or any patent subsequently issued on any application of such parties so involved. The Commissioner may, however, on a showing of good cause for failure to file within the time prescribed, permit the filing of the agreement or understanding during the six-month period subsequent to the termination of the interfer- ence as between the parties to the agreement or understanding.

The Commissioner shall give notice to the parties or their attorneys of record, a reasonable time prior to said termination, of the filing requirement of this section. If the Commissioner gives such notice at a later time, irrespective of the right to file such agreement or understanding within the six-month period on a showing of good cause, the parties may file such agreement or understanding within sixty days of the receipt of such notice." 35 U.S.C. § 135(c).

1a. 376 F.Supp. 439.

2. The June 26 opinion mischaracterized this procedure as a motion for summary judgment. There had in fact been an earlier motion for summary judgment filed by Pegasus asserting invalidity on these same grounds. That motion was denied because of certain unresolved fact issues surrounding termination of the interferences. The same legal issues were, however, carried over into this separate trial.

been some doubt as to whether the relationship between the unfiled agreement and termination of the interference was sufficient to meet the statutory test of connexity. Second, it was argued that the agreement in question was itself not of the type required to be filed. These issues will be individually considered, but first it is important to supplement the provisional findings of fact contained in the prior opinion. Those findings are approved and readopted here, except to the extent they may in any respect be inconsistent with the following recitation, in which case they stand modified accordingly.

### Summary of Events

Two interferences were involved. The first was declared in December of 1959, the second in August of 1962. The opposing parties in each case were plaintiff Moog and the Bell Aerospace Corporation.[3] Both parties were notified by the Patent Office of the filing requirements of section 135(c). On August 21, 1964, the parties entered into a written agreement which provided for a settlement procedure requiring the exchange of proofs, to be followed by concessions of priority. The parties also granted each other nonexclusive royalty-free cross-licenses under their respective applications, and each granted the other the right to sublicense third parties. This agreement was properly filed with the Patent Office for both interferences. After proofs had been exchanged and concessions filed, Moog and Bell entered into a written supplemental agreement dated March 16, 1965, which revoked the previously agreed-upon right of each to sublicense any patent awarded to the other as a result of the interference proceedings. This supplemental agreement was later filed, but not within the time prescribed in the statute.

### Origin and Importance of the Supplemental Agreement

On February 10, 1965, Moog and Bell exchanged documents relating to proof of priority, as provided for in the 1964 agreement. On February 15, 1965, Oser (Bell's attorney) telephoned Sommer (Moog's attorney) and reported that Bell was willing to concede priority to Moog in one interference, and Sommer indicated that Moog was tentatively willing to concede priority to Bell in the other. On February 17 Sommer telephoned Oser to report that the cross-concessions were acceptable. It was agreed that the respective concessions were to be prepared and signed but not filed until an understanding could be reached concerning revision of the 1964 settlement agreements to eliminate the sublicensing provisions. Sommer suggested such a revision; Oser was to advise Sommer as to Bell's position on Sommer's proposal. On February 25, after consulting with his client, Oser telephoned Sommer advising that Bell had no objection to the proposed revision. Oser agreed to prepare a draft of the supplemental agreement. The concessions were mailed simultaneously on March 3, and were received in the Patent Office on March 4 and 5. Unexecuted copies of the supplemental agreement were mailed by Bell's attorney to Moog's attorney on March 3. These were signed on behalf of Moog and on March 8 were returned to Bell for completion. They were signed on behalf of Bell and dated on March 16. On May 11 the Patent Office acknowledged the filing and sufficiency of the concessions and terminated the interferences. Copies of the supplemental agreement were not submitted to the Patent Office until May 2, 1966.[4]

From this sequence of events several conclusions can be drawn. First,

---

3. The Moog application had been assigned by William Moog, Jr. to Moog Servocontrols, Inc., now Moog, Inc. The Bell applications were originally filed by J. D. Buchanan in one instance and Martin Wolpin and others in another. These were subsequently assigned to Bell.

4. Although the agreement submitted for one of the interferences (no. 92,963) was in fact a copy of the agreement in the other interference (no. 90,770), a mistake which was later corrected by submission of a copy of the correct agreement, the variance is immaterial. The supplemental agreements for the

the purpose and effect of eliminating the sublicensing provisions in the original settlement agreement was to eliminate the potential for competition in the granting of licenses which would result from each party having the power independently to license third parties under either patent.[5] The result was to restore to each patentee the exclusive power to grant further licenses under its own patent. Second, there was an understanding between Moog and Bell as of February 25, 1965, that such a modification of the 1964 agreement was to be made prior to the filing of the parties' concessions of priority. And third, this understanding was a condition precedent to the filing of those concessions, which was in turn a condition precedent to termination of the interferences.

### Relation of the Supplemental Agreement to Termination of the Interference

As noted in the previous opinion, the statutory reference to agreements made "in connection with or in contemplation of" termination requires a "definite link between the settlement of an interference and the agreement or un-

derstanding."[6] Whether and to what extent that link must be one of causality was, under the facts as previously known, a significant issue. Assuming that the supplemental agreement was not consummated until formally executed by both parties on March 16, it would have antedated the formal termination on May 11 but would have followed the submission of concessions on March 3, which effectively settled the interference and insured its later pro forma termination by the Patent Office. It would have been connected with and contemplated the settlement of the interference in the sense that it affected who would enjoy the benefits of the patents issued as a direct result of the settlement, but would not have altered the determination of priorities, the filing of concessions, the formal termination, or the ultimate issuance of the patents. To the extent it was merely incidental to the settlement and did not affect the termination, it might arguably fall outside the scope of congressional intent as embodied in section 135(c). There is little helpful case law on the subject,[7] and the legislative history is conflicting.[8]

two interferences were identical in their terms (and will hereinafter be referred to occasionally as a single agreement), and in any event the dates of filing of both the incorrect and the correct copies were beyond the statutory period.

5. At the time of the original agreement neither Moog nor Bell was assured of winning either interference, and the sublicensing provision eliminated the risk of total loss for both parties. However, once they had determined that each was to prevail on certain claims, and that the resultant patents would be blocking patents, the original risk against which both had sought protection was eliminated, and because the value of each patent would be enhanced if held by only one rather than two potential licensors, the parties followed their economic self-interest and eliminated the original pooling-type arrangement.

6. Memorandum Opinion of June 26, 1973, 376 F.Supp. at 439.

7. It seems there are only two reported opinions in which a court has applied 35 U.S.C. § 135(c), and in neither case did this issue arise. In both Esso Research & Eng'r Co. v. Brenner, 165 U.S.P.Q. 486 (D.C.Cir. 1970), and Old Dominion Box Co. v. Continental Can Co., 273 F.Supp. 550 (S.D.N.Y. 1967), aff'd, 393 F.2d 321 (2d Cir. 1968),

the relationship between the unfiled agreement and termination of the interference was strong and direct. In *Esso* "a settlement agreement was rendered and the interference proceeding terminated". 165 U.S.P.Q. at 487. In *Old Dominion* "[t]he agreement contained no specific provision for the termination of the interference proceedings as to the Weiss patent, yet the licensing of Federal under the Weiss patent, for all practical purposes, made it improbable that the interference proceedings would or could be continued. The parties to the agreement apparently recognized that fact, for on the very day the contract was entered into counsel for Continental wrote counsel for Federal in regard to the matter of terminating the interference proceedings, which was done." 273 F.Supp. at 562. Yet in each case the court used language implying that the statute should be applied "as written", a construction which would presumably include agreements far less directly connected to termination than those revealed in *Esso* and *Old Dominion*. See 165 U.S.P.Q. at 487; 273 F.Supp. at 562.

8. Throughout the legislative history the type of agreement of which filing would be re-

■ This difficult question need not be decided, however, in view of the submission of proof that the supplemental agreement of March 16 was the formalization of an understanding between the parties to the interference which dates back to February 25, 1965, well before the concessions were filed. At least as of that date, an understanding or agreement within the meaning of the statute existed between the interference parties. The use by Congress of the word "understanding" conveys as clearly as possible its intent to include any meeting of the minds of whatever proportions. An understanding is not exempted from the requirements of section 135(c) merely because it is tentative or informal or because certain details are to be filled in at a later date.

■ Moog has not denied the events in question. Instead, it argues that it is the determination of priority, not the mere filing of concessions, which is the crucial act in termination, and it is that to which the understanding or agreement must be related.

This position is unacceptable. Assuming arguendo that the agreement must in some way be causally related to the termination, the fact remains that this supplemental agreement was a condition precedent to the filing of the concessions, and it was the act of filing these

concessions, not the determination of priority, which effected the termination. The situation is not unlike that of any litigant who informally concedes liability. Such an admission may be damning proof against him, but unless he can be persuaded to formally stipulate as to his liability and acquiesce in a settlement of the case, the trial must still be held. A party's admission that his case is hopeless does not of its own force authoritatively declare it so, nor does it end the case if the declarant insists upon the exhaustion of his procedural rights. Because the parties' priority determinations could not have terminated the interferences unless they were submitted to the Patent Office as formal concessions, and because the agreement to remove the sublicense rights was made a precondition to the filing of those concessions, that agreement was made "in connection with or in contemplation of the termination of the interference" under even the most stringent and demanding interpretation of the necessary connexity. How much less would suffice need not now be determined.

### Antitrust Implications of the Supplemental Agreement

■ The opinion of June 26 held that only agreements having "antitrust implications" were required to be filed under

quired was referred to as a "settlement agreement", and usage clearly indicates that reference was generally being made to those agreements which cause an interference to be settled and consequently terminated. *See,* *e. g.,* S.Rep.No.2169, 87th Cong., 2d Sess. 2 (1962), *reprinted in* 1962 U.S.Cong.Code & Ad.News 3286, at 3286:

"The purpose of this bill is to amend the patent laws to require the filing in the Patent Office of agreements settling patent interference proceedings. . . . Interference proceedings may be terminated in a manner hostile to the public interest by using patent interference settlement agreements as a means of restricting competition. To make such a practice more difficult the bill requires the filing of such agreements in the Patent Office."

*See also* H.R.Rep.No.1983, 87th Cong., 2d Sess. 1 (1962): "H.R. 12513 would amend the patents laws to require the filing in the

Patent Office of agreements settling patent interference proceedings." But on the other hand, there are occasional references which seem to contemplate a somewhat broader meaning for the "connection or contemplation" language. *See, e. g.,* Hearings on H.R. 11015 Before Subcomm. No. 3 of the House Comm. on the Judiciary, 87th Cong., 2d Sess. 11 (1962) (comment of Rep. Willis, chairman of the subcommittee and chief sponsor of the House bill, referring to "side agreements"); *id.* at 17: "The bill in my view . . . would be meaningless if it didn't contemplate that the agreement filed . . . should be the whole agreement."
For a further examination of the legislative history of this provision, in addition to the sources cited above, *see generally* Hearings on H.R. 12513 Before the Subcomm. on Patents, Trademarks and Copyrights of the Senate Comm. on the Judiciary, 87th Cong., 2d Sess. (1962).

section 135(c).[9] Because of the direct connection subsequently revealed between the supplemental agreement and termination of the interference in this case, that condition is now clearly met.

If the agreement materially affects either the issuance or the utilization of a patent, it is intrinsically a matter of significance under the antitrust laws. A patent is a strictly limited exemption from the prohibitions against anticompetitive conduct which would otherwise apply to the patentee's monopolistic practices.[10] If a patent is improperly obtained or used, the anticompetitive activities undertaken on its authority may not be protected by the patent laws and may violate the antitrust laws.[11]

Thus, any agreement having a causal link with the termination of an interference (*i.e.*, a nonincidental agreement) *per se* has antitrust implications (assuming of course that the termination materially affects ultimate issuance of the patent). Because the supplemental agreement between Moog and Bell was a condition precedent to termination, and was thus essential to issuance of the patent which Moog now seeks to enforce, the agreement was by that fact alone possessed of antitrust implications and should have been timely filed.

■ The supplementary between Moog and Bell thus falls within the purview of 35 U.S.C. § 135(c). Because it was not timely filed, the patent obtained

---

9. The parties have read far more into this holding than was originally intended. It is essentially nothing more than an application of the maxim *de minimis non curat lex*, designed to remove from the statutory ambit agreements so insignificant or innocuous that imposition of a forfeiture for nonfiling would be totally inappropriate and unnecessary, and therefore presumably not intended by the Congress. As noted in the text following this footnote, this problem does not arise if the connection between the agreement and termination is direct and substantial. Such agreements, whatever their content, are necessarily possessed of antitrust significance. However, if the statute is read as also applying to incidental or collateral agreements having only a minimal "connection with" the termination of an interference, then the statute's potential reach is enlarged beyond its rationale of deterring and exposing improper agreements. Admittedly the filing requirement is essentially prophylactic rather than remedial, and thus must apply to all agreements which offer the slightest potential for producing illicit consequences. An after-the-fact determination that the agreement was in fact proper is insufficient to excuse noncompliance. Yet it is conceivable that certain agreements literally connected with or made in contemplation of termination would nevertheless be so far removed from even the *possibility* of impropriety, that even the broad prophylactic purposes of the statute would not be furthered by its application to them. This exception is obviously of very limited scope and will be properly invoked only in rare circumstances. Because it has become clear that it does not apply in this case (*see* text, *infra*), there is no need to further define its particulars.

10. *See, e. g.*, United States v. Line Material Co., 333 U.S. 287, 309–310, 68 S.Ct. 550, 92 L.Ed. 701 (1948).

11. For example, the fraudulent procurement of a patent renders it void. Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). Proof of fraudulent procurement would therefore strip the patentee of its exemption from the antitrust laws, and require that any anticompetitive actions taken under the aegis of the invalid patent be carefully examined to determine if they contain the elements of an antitrust violation. Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). Likewise, "[b]eyond the limited monopoly which is granted, the arrangements by which the patent is utilized are subject to the general law". United States v. Singer Mfg. Co., 374 U.S. 174, 196, 83 S.Ct. 1773, 1785, 10 L.Ed. 2d 823 (1963); United States v. Masonite Corp., 316 U.S. 265, 277, 62 S.Ct. 1070, 86 L. Ed. 1461 (1942), and "the improper use of that monopoly" may subject the patentee to antitrust liability. United States v. Line Material Co., 333 U.S. 287, 310, 68 S.Ct. 550, 562, 92 L.Ed. 701 (1948).

Although not every misuse of a patent necessarily constitutes an antitrust violation, Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 140–141, 89 S.Ct. 1562, 23 L. Ed.2d 129 (1969), the potential is sufficiently great to make the use and misuse of patents *per se* a matter of interest and significance under the antitrust laws. *Cf.* Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., *supra*.

by Moog as a result of the termination of the interferences is unenforceable. Unenforceability is an absolute defense to a claim of infringement, and judgment must therefore be rendered for the defendant.

An appropriate order may be submitted.