**MOOG INCORPORATED,**
**Plaintiff-Appellant,**

v.

**PEGASUS LABORATORIES, INC.,**
**Defendant-Appellee.**

No. 74–2190.

United States Court of Appeals,
Sixth Circuit.

Sept. 5, 1975.

502

---

Alfonse J. D'Amico, Barnes, Kisselle, Raisch & Choate, Detroit, Mich., Kenneth R. Sommer, Buffalo, N. Y., for plaintiff-appellant.

Dale R. Small, Whittemore, Hulbert & Belkamp, Detroit, Mich., William L. Mathis, Washington, D. C., for defendant-appellee.

Before PHILLIPS, Chief Judge, EDWARDS and PECK, Circuit Judges.

EDWARDS, Circuit Judge.

This case involves a United States Patent Office interference proceeding and a statute which regulates any private agreements which are employed to settle such disputes. This statute, 35 U.S.C. § 135(c) (1970), reads as follows:

(c) Any agreement or understanding between parties to an interference, including any collateral agreements referred to therein, made in connection with or in contemplation of the termination of the interference, shall be in writing and a true copy. thereof filed in the Patent Office before the termination of the interference as between the said parties to the agreement or understanding. If any party filing the same so requests, the copy shall be kept separate from the file of the interference, and made available only to Government agencies on written request, or to any person on a showing of good cause. Failure to file the copy of such agreement or understanding shall render permanently unenforceable such agreement or understanding and any patent of such parties involved in the interference or any patent subsequently issued on any application of such parties so involved. The Commissioner may, however, on a showing of good cause for failure to file within the time prescribed, permit the filing of the agreement or understanding during the six-month period subsequent to the termination of the interference as between the parties to the agreement or understanding.

The Commissioner shall give notice to the parties or their attorneys of record, a reasonable time prior to said termination, of the filing requirement of this section. If the Commissioner gives such notice at a later time, irrespective of the right to file such agreement or understanding within the six-month period on a showing of good cause, the parties may file such agreement or understanding within sixty days of the receipt of such notice.

We hold that this statute is designed to restrict monopolistic practices and (at least for purposes of this case) means just what it says and requires no interpretation. In the facts of this appeal the statute clearly required the District Judge and clearly requires us to find that the patent in suit is "permanently unenforceable."

Plaintiff-appellant Moog, Inc., appeals from a holding by the United States District Court in the Eastern District of Michigan that Patent No. 3,228,423, held by Moog pertaining to a dry motor type electro-hydraulic servovalve is "permanently unenforceable" under 35 U.S.C. § 135(c) (1970). This litigation originated as a suit brought by Moog against Pegasus Laboratories, Inc., for alleged infringement of its servovalve patent. By answer and amended answer Pegasus pleaded the defense of unenforceability under 35 U.S.C. § 135(c) (1970), and sought summary judgment.

The District Judge accepted for purposes of Pegasus' summary judgment motion Moog's own proposed findings of facts. The District Judge entered two opinions, *Moog, Inc. v. Pegasus Laboratories, Inc.*, 376 F.Supp. 439 (E.D.Mich. 1973); *Moog, Inc. v. Pegasus Laboratories, Inc.*, 376 F.Supp. 445 (E.D.Mich. 1974). The first dealt with Moog's procedural objections to consideration of the Pegasus defense based on § 135. No appellate issue is presented on this score. The District Judge also held, however, that § 135 should not be read as requiring the filing on pain of permanent unenforceability of a supplemental agreement providing "only incidental modification to a termination agreement" where "there are no antitrust implications, real or potential." 376 F.Supp. at 445. He set the case for hearing upon the question as to whether there was a "definite link between the settlement of an interference and the [disputed] agreement or understanding." 376 F.Supp. at 443, 448.

After further proceedings to develop the complete documentary record of the negotiation, execution and ultimate filing of the supplemental agreement, the District Judge entered a second opinion summarizing the pertinent facts:

Two interferences were involved. The first was declared in December of 1959, the second in August of 1962. The opposing parties in each case were plaintiff Moog and the Bell Aerospace Corporation. Both parties were notified by the Patent Office of the filing requirements of section 135(c). On August 21, 1964, the parties entered into a written agreement which provided for a settlement procedure requiring the exchange of proofs, to be followed by concessions of priority. The parties also granted each other nonexclusive royalty-free cross-licenses under their respective applications, and each granted the other the right to sublicense third parties. This agreement was properly filed with the Patent Office for both interferences. After proofs had been exchanged and concessions filed, Moog and Bell entered into a written supplemental agreement dated March 16, 1965, which revoked the previously agreed-upon right of each to sublicense any patent awarded to the other as a result of the interference proceedings. This supplemental agreement was later filed, but not within the time prescribed in the statute.

\*     \*     \*     \*     \*     \*

On February 10, 1965, Moog and Bell exchanged documents relating to proof of priority, as provided for in the 1964 agreement. On February 15, 1965, Oser (Bell's attorney) telephoned Sommer (Moog's attorney) and reported that Bell was willing to concede priority to Moog in one interference, and Sommer indicated that Moog was tentatively willing to concede priority to Bell in the other. On February 17 Sommer telephoned Oser to report that the cross-concessions were acceptable. It was agreed that the respective concessions were to be prepared and signed but not filed until an understanding could be reached concerning revision of the 1964 settlement agreements to eliminate the sublicensing provisions. Sommer suggested such a revision; Oser was to advise Sommer as to Bell's position on Sommer's proposal. On February 25, after consulting with his client, Oser telephoned Sommer advising that Bell had no objection to the proposed revision. Oser agreed to prepare a draft of the

supplemental agreement. The concessions were mailed simultaneously on March 3, and were received in the Patent Office on March 4 and 5. Unexecuted copies of the supplemental agreement were mailed by Bell's Attorney to Moog's attorney on March 3. These were signed on behalf of Moog and on March 8 were returned to Bell for completion. They were signed on behalf of Bell and dated on March 16. On May 11 the Patent Office acknowledged the filing and sufficiency of the concessions and terminated the interferences. Copies of the supplemental agreement were not submitted to the Patent Office until May 2, 1966.

376 F.Supp. at 447. (Footnotes omitted.)

The District Judge then concluded:

From this sequence of events several conclusions can be drawn. First, the purpose and effect of eliminating the sublicensing provisions in the original settlement agreement was to eliminate the potential for competition in the granting of licenses which would result from each party having the power independently to license third parties under either patent. The result was to restore to each patentee the exclusive power to grant further licenses under its own patent. Second, there was an understanding between Moog and Bell as of February 25, 1965, that such a modification of the 1964 agreement was to be made prior to the filing of the parties' concessions of priority. And third, this understanding was a condition precedent to the filing of those concessions, which was in turn a condition precedent to termination of the interferences.

376 F.Supp. at 447–48. (Footnotes omitted.)

Since the facts in this record appear to us to support (indeed to compel!) the District Judge's findings of fact and conclusions of law as arrived at in his second opinion, we find no need to deal in this case with the questions considered in his first opinion.

■■■ The patent law of the United States is not designed to allow private parties to determine amongst themselves who shall have the right to a legal monopoly. *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 815–16, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). Even less is it intended to support the negotiated grant of two patents upon one invention where the purpose and effect may be that any potential licensee must pay tribute to two separate patentholders. *See generally United States v. Addyston Pipe and Steel Co.*, 85 F. 271, 282–83 (6th Cir. 1898), *aff'd*, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899).

Moog's brief discusses its rationale for desiring this result:

[The] desire to revoke the sublicense provisions was motivated by a lawful business purpose. Having determined that Wolpin *et al.* was entitled to the broad "flexure member" claims of Interference No. 90,770, but that W. C. Moog was entitled to the specific "flexure tube" claims of Interference No. 92,963, it became apparent to attorney Sommer that the Wolpin *et al.* and W. C. Moog applications would issue as blocking patents. That is, the Wolpin *et al.* patent would have a dominant "flexure member" claim, while the W. C. Moog patent would be subservient having a "flexure tube" claim. But since every "flexure tube" is necessarily a "flexure member", a prospective licensee who might desire to practice Moog's specific "flexure tube" invention would have to obtain rights under the dominant Wolpin *et al.* patent, as well as under the subservient W. C. Moog patent. Rights under both patents would be necessary regardless of whether such prospective licensee approached either Bell or Moog. Under the 1964 Agreements, Bell could grant a license under Wolpin *et al.* and a sublicense under the W. C. Moog patent; conversely, Moog could grant a license under the W. C. Moog patent and a sublicense under Wolpin *et al.* But it must be remem-

bered that such prospective licensee had no assurance that either Bell or Moog would grant such rights. Only the possibility existed.

Realizing that blocking patents would issue, attorney Sommer foresaw that the sublicense provisions in the 1964 Agreements would be undesirable to Moog for two practical reasons. First, Moog would not be able to pursue an infringer of its own specific "flexure tube" patent without fearing that such infringer might possibly negotiate a sublicense under Moog's own patent from Bell. Secondly, the 1964 Agreements did not require Bell to account to Moog for any royalties Bell might receive by granting sublicenses under Moog's own patent.

The practical effect of the patents as issued under the filed agreements with the cross-licensing features would have been at least the equivalent from the public point of view of joint ownership of one patent. As Moog points out, there might even have been competition in relation to licensing between Moog and Bell.

Actually, however, unbeknown to the Patent Office, Moog and Bell had also negotiated another agreement by which they revoked their prior undertaking, filed with the Patent Office, that granted licenses and the right to sublicense to each other. The effect of revocation was that neither party could thereafter grant sublicences under the other's patent. This agreement was formally executed on March 16, 1965, well before May 11, 1965, the date on which the Patent Office terminated the interference. Indeed, the patent in suit did not issue until January 11, 1966. The supplementary agreement was not filed until May 2, 1966, well after each and all of the potential filing dates specified in the provisions of § 135(c).

It appears to this court that this record shows that Moog and Bell did exactly what § 135 was designed to prevent. Their agreement to abrogate their previously filed agreement for cross-sub-

licensing was illegally withheld from the Patent Office. It represented the very sort of antitrust violation which § 135 was designed to restrain. If it had been disclosed as § 135 required, the nature of the agreement would have been likely to provoke "adverse" action by the Patent Office or the Justice Department.

In the course of consideration of § 135 before the Senate, the Department of Justice over Acting Attorney General Katzenbach's signature outlined the antitrust purpose contemplated for the bill and suggested the unenforceability provision which was enacted:

The Supreme Court in holding a private interference settlement to be so inequitable as to preclude the enforcement of the resulting patent stated in *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 815–816, 65 S.Ct. 993, 89 L.Ed. 1381 (1945):

" * * * The possession and assertion of patent rights are 'issues of great moment to the public' [citing cases]. A patent by its very nature is affected with a public interest. As recognized by the Constitution, it is a special privilege designed to serve the public purpose of promoting the 'progress of science and useful arts'. At the same time, a patent is an exception to the general rule against monopolies and to the right to access to a free and open market. The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope. The facts of this case must accordingly be measured by both public and private standards of equity."

The purpose of this legislation is to make it more difficult for patent applicants to use an interference settlement agreement as a means of violating the antitrust laws. It seeks to

accomplish this purpose by providing that no such agreement or understanding shall be enforceable unless all of its terms are in writing and filed prior to the termination of the interference proceeding. It is our view that this prohibition would not adequately deter violations of the antitrust laws. It is therefore suggested that the measure be amended to provide that parties to an interference settlement agreement shall be precluded from enforcing the resulting patent unless a copy of the settlement agreement has been filed with the Patent Office prior to the termination of the interference. In order to protect innocent parties who inadvertently fail to file a copy of their settlement agreement, the Commissioner of Patents should be given the authority to entertain, at any time during the 6-month period subsequent to the termination of the interference, a petition by either party for leave to file a copy of the agreement, which petition may be granted on a showing of good cause for the failure to file within the time prescribed. Further, it is suggested that the bill should provide a right of action in the United States to obtain a civil penalty for failure to file a copy of an interference agreement.

S.Rept.No.2169, 87th Cong., 2d Sess., Reported in 2 U.S.Code Cong. & Admin.News, pp. 3286, 3289 (1962).

The Senate Report on § 135 recited its central purpose:

> The purpose of this bill is to amend the patent laws to require the filing in the Patent Office of agreements settling patent interference proceedings. When two or more applicants claim substantially the same invention an interference is declared in order to determine which applicant is entitled to priority. Interference proceedings may be terminated in a manner hostile to the public interest by using patent interference settlement agreements as

a means of restricting competition. To make such a practice more difficult the bill requires the filing of such agreements in the Patent Office.

*Id.* U.S.Code Cong. & Admin.News, 1962 at p. 3286.

As we see this matter (and as the District Judge saw it), the withholding of the supplemental agreement cannot be considered an inadvertence.[1] *Cf. Esso Research & Engineering Co. v. Brenner,* 165 U.S.P.Q. 486 (D.C.Cir. 1970). The District Court was right in finding a causal relationship between the withholding and the termination of the interference. He was also right in holding that the patent in suit was "permanently unenforceable" under § 135(c).

The judgment of the District Court is affirmed.

---

1. By noting this, we do not mean to pass on what the legal effect of an opposite conclusion would be.